# EX-MISSION LAND AND WATER COMPANY, Respondent, *v.* H. L. FLASH et al., Appellants.

Corporations — Fraud of Promoters — Setting aside Decree of Foreclosure — Cancellation. — A corporation may maintain an action to annul a decree of foreclosure of a mortgage upon its property, and to cancel the notes and mortgage for fraud in their procurement by false representations of the promoters of the corporation and their agents, made to subscribers to stock, as to the price at which the land was obtained by the promoters under a bid at an administrator's sale, and that it was intended, in organizing the corporation, to place all the stockholders upon an equal footing, by purchase of the land at the bottom price at which it was bid in at the sale, and to complete the purchase at the price bid, and by fraudulent concealment from the other subscribers of the fact that two of the subscribers were agents of the promoters, acting for a commission to sell the land to the corporation at a price much greater than the amount of the bid, whereby the subscribers were induced to subscribe to the stock and to consent that the corporation should execute the notes and mortgage for such greater price.

Id. — Agreement between Subscribers — Purchase by Corporation — Assignment — Right of Action for Fraud. — Where an agreement between individuals, who afterwards became subscribers to the stock of a corporation, agreeing individually to purchase land in the proportions in which they became subscribers to such stock, was not a binding contract of purchase, for want of a party who proposed or agreed to sell, and the intention of the subscribers to the agreement was not to purchase the land individually, but to become subscribers to a corporation to be organized, which should purchase the land, and which obtained a deed under the contract to purchase it, and executed notes and mortgage for the purchase-money, the corporation must be regarded as the purchaser, and it is not necessary that the subscribers to the agreement should assign to the corporation their right of action for fraud in the sale of the land to them.

Id. — Promoter Defined — Fiduciary Relation to Corporation — Subscription of Share-holders upon Trust. — A promoter of a corporation is a person who, by his active endeavors, assists in procuring the formation of the company and the subscription of its shares, whether he afterwards becomes connected with the company or not, and he is considered in law as occupying a fiduciary relation to the corporation and to its shareholders who subscribe upon the trust that the promoters will control the enterprise for the benefit of the company.

Id. — Purchase from Promoter — Duty to Disclose Facts — Misrepresentation — Actions by Corporation. — A promoter of a corporation, who induces others to subscribe for shares for the purpose of selling property to the company when organized, must faithfully disclose all facts relating to the property which would influence those who form the company in deciding upon the judiciousness of the purchase, and if he is guilty of any misrepresentation of facts or suppression of truth in

relation to the character and value of the property or his personal in-
terest in the proposed sale, the company will be entitled to set aside
the transaction, or recover compensation for any loss it has suffered.

Id. — Agency to Sell Land of Promoters — Authority to Promote —
Evidence. — Authority to agents of the promoters of a corporation to
sell the land of the promoters to the corporation for a commission tends,
in connection with other evidence, to prove authority to such agents to
promote the corporation.

Id. — Declarations of Agents — Co-conspirators. — The agents having
represented the promoters in promoting the corporation as part of a
scheme to sell the land of the promoters to the corporation for the bene-
fit of all the conspirators, evidence as to what they said to induce sub-
scriptions to the agreement to purchase the land by the corporation is
competent as against their co-conspirators.

Id. — Setting aside Judgment of Foreclosure — Laches — Knowl-
edge of Fraud. — An action by the corporation to set aside the decree of
foreclosure, and to cancel the mortgage given for purchase-money, on the
ground of fraud of the promoters of the corporation in selling land to
the corporation and procuring the mortgage, is not barred by laches be-
cause it appeared that the defrauded stockholders had general notice of
the fraud within one month after the foreclosure sale, and no motion
was made within six months to set aside the decree, when it does not
appear that they were then sufficiently informed of the particulars of
the fraud, or as to the evidence by which the fraud might be proved in
court, or as to how many of the stockholders participated in the fraud,
or as to where to apply for reliable information, and it appeared that a
majority of the board of directors having notice of the original fraud,
which was a defense to the foreclosure proceedings, had willfully and
fraudulently permitted the judgment to be taken by default, that the
stockholders resided some distance apart, and that as soon as possible
they elected a new board of directors, and immediately thereafter au-
thorized the bringing of the action by the corporation, which was com-
menced two months and nineteen days thereafter, although eight months
had elapsed after the judgment of foreclosure before the action was
brought.

Id. — Remedy by Motion — Fraud — Limitation. — A motion to set aside
a judgment on the ground of fraud in its procurement is not subject to
the limitation of six months provided in section 473 of the Code of Civil
Procedure.

Id. — Concurrent Remedies — Suit in Equity. — The remedy by motion
to set aside a judgment on the ground of fraud is not an exclusive remedy,
where such relief is not perfectly adequate, but is only one step which
might be taken to secure equitable relief in the action; and in such case
a separate equitable action may be brought to obtain the whole relief
required.

Id. — Suit in Equity — Lapse of Time — Bar of Equitable Remedy. —
The mere lapse of time less than the statutory period of limitation will
not bar an action for equitable relief, unless the delay, under the circum-
stances, has been such as to justify the presumption that the defendant
*may* have been prejudiced thereby. The bar of an equitable remedy in
such cases is not imposed upon the plaintiff as a penalty for his negli-

gence, but is intended merely to protect the defendant from such conse-
quences of the delay as may be prejudicial to his rights.

Id. — Unprejudicial Delay — Non-waiver of Rights of Defendant
Stockholders — Election of New Board of Directors — Suit by
Corporation. — Where it appeared that nothing in the facts and cir-
cumstances of the case indicated acquiescence of the defrauded stock-
holders in the wrongs complained of, or a waiver of their rights, and
neither the situation of the defendants nor the condition of the property
was so changed during or in consequence of the delay in bringing suit
as to cause the judgment of foreclosure to be more onerous than it would
have been if the action had been commenced sooner, and it further ap-
peared that all of the persons who participated in or had any knowledge
of the transactions were living and testified at the trial, and all docu-
ments claimed to be material for the defense were produced, and it was
shown that during the first six months after the rendition of the judg-
ment the plaintiff corporation was under the control of the defendants
and their associates in fraud, the delay in bringing suit until a new
board was elected, to bring it in the name of the corporation, and until
eight months after the judgment was rendered, cannot be said to be
such laches as to bar the action.

Id. — Prior Purchase of Land by Promoters — Fraudulent Secret
Profits — Recovery by Corporators. — The fact that the defendants
purchased the land at an administrator's sale before the corporation was
formed, or any steps taken towards its formation, does not prevent the
recovery by the corporation of "secret profits" realized by such pur-
chasers in the sale to the corporation, when it appears that the defend-
ants placed themselves in a fiduciary relation to the corporation by
promoting it, and while in that relation, by means of fraudulent repre-
sentations and concealments, induced the corporation to purchase their
land, whereby the "secret profits" were made; and the annulment of a
decree of foreclosure, and the cancellation of notes and mortgage given
for the purchase-money, though not equivalent to a full recovery of all
the fraudulent "secret profits" realized by the purchasers, and inuring
equally to the benefit of all the stockholders, is appropriate relief to the
extent to which it goes.

Id. — Contract of Sale — Rescission for Fraud — Concurrent Rem-
edy — Cancellation of Mortgage for Part Purchase-money. — A
rescission of the sale and restoration of the land to the defendant, for
fraud, even if a practicable mode of relief, is not exclusive of any other
appropriate mode by which a court of equity might give appropriate
relief, doing no injustice to the defendants; and where rescission does
not appear to be practicable, and the defendants have not requested a
rescission, or tendered repayment of moneys wrongfully obtained by
them upon the purchase, they are not in a condition to claim that
rescission was the exclusive remedy, and that the cancellation of notes
or mortgage given for part of the purchase-money, which does not give
full relief for the fraud, is not appropriate relief.

Id. — Retention of Commissions by Agents of Promoters — Griev-
ance between Co-conspirators or Stockholders. — Where the
relief granted to the corporation is equally favorable to all the stock-
holders, the fact that the effect of the decree is more favorable to the

agents of the promoters who retain their commissions besides their stock, than to the promoters of the corporation, is not a matter which concerns the corporation, and no grievance between the co-conspirators in the fraud, or between individual stockholders, can be redressed in the action by the corporation.

Appeal from a judgment of the Superior Court of San Diego County, and from an order denying a new trial.

The facts are stated in the opinion.

*Gibbon & Creighton, Wellborn, Parker & Stevens,* and *A. W. Hutton,* for Appellants.

The action was improperly brought in the name of or by the corporation, as the matters complained of, if true, were wrongs done, not to the corporation, but to the individual members of the syndicate. (*Getty* v. *Devlin,* 54 N. Y. 403.) No cause of action is shown against the defendants, for the reason that the defendants were not promoters of the corporation. (Cook on Stocks and Stockholders, 2d ed., sec. 651; *St. Louis etc. R'y Co.* v. *Tiernan,* 37 Kan. 606; 1 Morawetz on Corporations, sec. 545.) As there was no fiduciary relation as between the defendants and the corporation and its members, neither the misrepresentations as to the price paid for the land, nor the concealment of Childress's interest and the commissions paid Wilson and Coleman, were fraudulent, as they did not relate to material matters; and however censurable morally, they furnish no ground for relief at law. (*Tuck* v. *Downing,* 76 Ill. 71; *Banta* v. *Palmer,* 47 Ill. 99; *Blen* v. *R. R. etc. Co.,* 20 Cal. 615; *Commissioners etc.* v. *Younger,* 29 Cal. 172; *Baker* v. *Brown,* 82 Cal. 64.) Besides, with reference to the misrepresentations as to price, it will be further noted that the corporation plaintiff will not be heard to assert ignorance as to the price paid the Olvera estate, even were it material matter, because the muniments of title disclose the facts. (2 Devlin on Deeds, sec. 1000.) But if it be conceded that Childress and Flash were not only the vendors, but also promoters of the corporation, still the findings do

not support the judgment, for the reason that Childress and Flash bought the land for themselves, and on their own account, before the corporation was formed, or any steps taken towards its formation, and therefore the rule allowing the recovery of secret profits does not apply. (*Densmore Oil Co.* v. *Densmore,* 64 Pa. St. 43; Cook on Stocks and Stockholders, 2d ed., sec. 651, note 2; *Banta* v. *Palmer,* 47 Ill. 99; *Tuck* v. *Downing,* 76 Ill. 71; *St. Louis etc. R. R. Co.* v. *Tiernan,* 37 Kan. 606.) Plaintiff is barred by its own laches from availing itself of this action to set aside the decree in the action of foreclosure. Its failure to move to set aside the judgment bars its right to proceed in this case. (*Ede* v. *Hazen,* 61 Cal. 360.) The notice of the stockholders of the facts upon which this action was based charged the corporation with notice of them; and the stockholders having received notice of the existence of such facts in time to move to set aside the judgment, the corporation was guilty of laches in not making the motion. (Morawetz on Corporations, sec. 229; *Simmons Creek Coal Co.* v. *Doran,* 142 U. S. 417.) As the plaintiff and the real parties in interest might have not only removed the recalcitrant officers, but also might have availed themselves of their rights of action which accrued upon the failure or refusal of the directors to act, and as they failed to exercise due diligence to move to set aside the foreclosure decree, the relief sought in this action should be denied. (*Ede* v. *Hazen,* 61 Cal. 360; *Borland* v. *Thornton,* 12 Cal. 440; *Mastick* v. *Thorp,* 29 Cal. 445; *Bibend* v. *Kreutz,* 20 Cal. 110; *Ketchum* v. *Crippen,* 37 Cal. 233; *Neal* v. *Byers,* 45 Cal. 234; *Amador C. & M. Co.* v. *Mitchell,* 59 Cal. 168; *Zellerbach* v. *Allenberg,* 67 Cal. 296.) The course pursued by each of these share-holders between the dates of their receiving notice of the facts affecting defendants, relied on in this action, and the entry of the default in the foreclosure proceeding, not only amounts to laches, but was a ratification of the acts complained of. (*Thompson* v. *C. F. & M. I. Co.,* 6 Am. & Eng. Corp. Cas. 263; *Twin Lick Oil Co.* v. *Marbury,*

91 U. S. 587; *Kelly* v. *Newburyport R'y Co.*, 24 Am. & Eng. R. R. Cas. 32; Story's Eq. Jur., 13th ed., sec. 1540, and cases there cited.)

*Chapman & Hendrick, Conklin & Hughes, Hunsaker, Britt & Goodrich,* and *James G. Garrison,* for Respondent.

The action was properly brought in the name of the corporation. (1 Morawetz on Corporations, sec. 546; *King* v. *Wise,* 43 Cal. 629; *Barry* v. *Bennett,* 45 Cal. 80; Bigelow on Fraud, 315.) The contention that the corporation lost its right to maintain this action by negligence in not pursuing their motion in the original action is without merit, as upon no motion made in the original action at any time could the plaintiff have obtained the relief sought and given in this action. (*Lapham* v. *Campbell,* 61 Cal. 296; *California Beet Sugar Co.* v. *Porter,* 68 Cal. 369; *Baker* v. *O'Riordan,* 65 Cal. 368; *Archbishop* v. *Shipman,* 69 Cal. 586.)

Vanclief, C. — The defendants, having foreclosed a mortgage on the land of the plaintiff, purchased the land at the foreclosure sale for a sum less than the amount due on the mortgage, and caused a judgment to be docketed against the plaintiff for the deficiency. The plaintiff brought this action to set aside and annul the decree of foreclosure and the judgment for the deficiency, and also to cancel the notes and mortgage on which the decree was founded, on the alleged ground of fraud in procuring the notes and mortgage.

The judgment of the court below was in favor of the plaintiff, granting all the relief prayed for. Defendants appeal from the judgment, and from an order denying their motion for a new trial.

The facts, as found by the court, relevant to the questions presented are substantially as follows: In March, 1887, the administrator of the estate of Augustine Olvera offered for sale, at public auction, a tract of land situate in the county of San Diego, containing four thousand

five hundred acres, pursuant to order of the superior court of the county of Los Angeles, in which said estate was then being administered.

One Charles H. Forbes requested the defendants to join him in the purchase of the land, and to furnish the money to make a payment of ten per cent of the purchase-money required to be paid at the time of the bid, which they did.

On March 19, 1887, Forbes bid in the land at the price of $5.05 per acre, and paid ten per cent of the purchase-money, furnished by defendants, amounting to $2,272.50, it being understood that Forbes, Flash, and Childress should be equally interested in the purchase.

On April 15, 1887, the sale was confirmed by the court as a sale to Forbes alone. A copy of the order of confirmation was delivered to Forbes on April 15th, but was not recorded in San Diego County until June 6, 1887.

In the latter part of April, 1887, the defendants and Forbes employed H. T. D. Wilson and N. D. Coleman to sell the land, and for that purpose to organize a corporation to make the purchase from the estate of Olvera, at the price of twenty-five dollars per acre, amounting to one hundred and twelve thousand five hundred dollars, for which, in case of such sale, Wilson and Coleman were to be paid a commission of five dollars per acre, amounting to twenty-two thousand five hundred dollars.

On May 8, 1887, a written agreement was signed between Forbes, Flash, and Childress of the first part, and Wilson of the second part, witnessing, —

"That the said parties of the first part, in consideration of the covenants and agreements on the part of the said party of the second part hereinafter contained, agree to sell and convey unto the said party of the second part, and said second party agree to buy, all that certain lot or parcel of land situate in the county of San Diego, and state of California, and bounded and particularly described as follows, to wit: All that portion of that certain rancho situated in the county of San Diego,

state of California, known as the Rancho Ex-Mission of San Diego, described as follows: . . . . containing about 4,500 acres, for the sum of one hundred and twelve thousand five hundred dollars, gold coin of the United States; and the said party of the second part, in consideration of the premises, agrees to pay said sum to the said parties of the first part, the said sum of $112,500 to be paid as follows, to wit: $10,000 on or before May 20, 1887; $27,500 within sixty days; $20,000 within six months; $20,000 within twelve months; $20,000 within eighteen months; $15,000 within twenty-four months. Deferred payments to be secured by mortgage on said land, and to bear eight per cent interest per annum from date.   The parties of the first part agree to release land under above agreement at the rate of fifty dollars per acre outside of town sites, and at rate of one hundred and fifty dollars per acre in town sites.

" And the said party of the second part agrees to pay all state and county taxes or assessments of whatsoever nature which are or may become due on the premises above described.

" It is further agreed that time is of the essence of this contract, and in the event of a failure to comply with the terms hereof, by the said party of the second part, the said parties of the first part shall be released · from all obligations in law or in equity to convey said property, and said party of the second part shall forfeit all right thereto, and to moneys heretofore paid under this contract, and their interest in or to said moneys or said property shall thereupon immediately cease as fully as if said moneys had never been paid or this agreement entered into.   And the said parties of the first part, on receiving such payment at the time and in the manner above mentioned, agree to execute and deliver to the said party of the second part, or to his assigns, a good and sufficient deed of grant, bargain, and sale.

" And it is understood that the stipulations aforesaid

are to apply to and bind the heirs, executors, administrators, and assigns of the respective parties.

"In witness whereof, the said parties to these presents have hereunto set their hands and seals the day and year first above written.

"Chas. H. Forbes.
"H. L. Flash.
"A. D. Childress.
"Harvey T. D. Wilson,
"Per N. D. Coleman."

This agreement was prepared by Childress, and signed by Coleman for Wilson during Wilson's absence; and the court finds that it was a sham, and not intended to be binding upon either party.

On May 20, 1887, the following agreement, called the subscription contract (plaintiff's Exhibit A), was drawn, and subscribed by all the parties thereto at or within a few days after its date: —

"Los Angeles, California, May 20, 1887.

"We, the undersigned, hereby agree to pay for the proportion of property hereinafter described, as is set opposite our signatures, according to the terms stipulated in this writing.

"We agree to buy forty-five hundred acres of land in San Diego County, lying north of the city of San Diego about six miles, to wit: —

"All that portion of that certain rancho situate in the county of San Diego, state of California, known as the Rancho Ex-Mission of San Diego, described as follows, to wit: . . . . containing about forty-five hundred acres. For the foregoing land the sum of one hundred and twelve thousand five hundred dollars, in legal money of the United States, is to be paid on the following terms, — the same being twenty-five dollars per acre: ten thousand dollars down, to bind the trade; twenty-seven thousand five hundred dollars within sixty days, without interest; thirty-seven thousand five hundred dollars in one year; and the balance, thirty-

seven thousand five hundred dollars, in two years from date of purchase. Deferred payments to be secured by mortgage on said land, and to bear eight per cent (8%) interest per annum from date. The parties buying being guaranteed a release on any part they may sell, upon their paying for the part so released at the rate of fifty dollars per acre outside of town sites, and at the rate of $150 per acre in town sites. It is further agreed that parties selling shall furnish satisfactory abstracts fifteen days prior to the second payment ($27,500.00), and that the ten thousand dollars, first payment, shall remain in the Childress Safe Deposit Bank, of Los Angeles, California, in trust, until said abstract or title papers are presented.

"C. E. Mackey, one tenth; J. H. Outhwaite, per N. D. Coleman, one tenth; A. D. Childress, two tenths; P. C. Baker, one tenth; J. W. Montgomery, one tenth; Harvey T. D. Wilson, one tenth; Nicholas D. Coleman, one tenth; Flower, Jones & Co., one tenth; R. A. Thomas, one twentieth."

La Tourette, who took one twentieth, did not sign this contract, but authorized Coleman to take that share for him, and there is no question that he was a party to the contract.

On May 26, 1887, Forbes and the defendants executed to Wilson and Coleman the following instrument: —

"Los Angeles, Cal., May 26, 1887.

"Having entered into an agreement with H. T. D. Wilson and N. D. Coleman, of Los Angeles, California, for the sale of a certain tract of land, about forty-five hundred acres, lying in San Diego County, California, known as a part of lot seventy (70) of the Ex-Mission grant, for the sum of one hundred and twelve thousand five hundred dollars, on terms as shown by a bond or agreement held by them, which expires on May 21, 1887, we hereby set forth the terms of the commission we obligate ourselves to pay to said Coleman and said Wilson. We agree they shall receive the sum of

twenty-two thousand five hundred dollars, as follows: Out of the first ten thousand dollars cash payment that shall be made in the purchase of said land, said Coleman and Wilson shall receive three thousand dollars; out of the next payment of twenty-seven thousand five hundred dollars, they shall receive the sum of seven thousand dollars; the balance of said commission shall be paid, six thousand two hundred and fifty dollars in one year and six thousand two hundred and fifty dollars in two years from date of sale, with 8% interest per annum from date, by the surrender to said parties, four notes of thirty-one hundred and twenty-five dollars each, signed by the company purchasing, two of said notes due in one year and two of said notes to be due in two years from date of purchase. This agreement, however, is subject to the consummation of sale as set forth in agreement of sale made this day.

[Signed]                                    " CHAS. H. FORBES.
                                              "H. L. FLASH.
                                              " A. D. CHILDRESS."

On the fourth day of June, 1887, according to the verbal agreement and understanding of all the parties at the time the subscription agreement of May 20th was signed, the plaintiff corporation was organized with a capital stock of $500,000, divided into five hundred shares, 450 of which were subscribed for as follows: R. A. Thomas, 25; J. W. Montgomery, 50; C. E. Mackey, 50; J. H. Outhwaite, 50; P. C. Baker, 50; A. D. Childress, 100; N. D. Coleman, 50; H. T. D. Wilson, 50; and J. R. La Tourette, 25.

Between the time of the execution of the subscription agreement (May 20th) and the sixteenth day of July, 1887, Thomas, La Tourette, Montgomery, Mackey, Outhwaite, Flower, Jones & Co., and Baker paid to the defendant Childress, as trustee, to be applied to the purchase of the land by the corporation, the sum of twenty-six thousand seven hundred dollars, about one fifth part of which had been so paid before the organization of the corporation. Out of the money so paid to

him by the persons last above named, Childress, on July 16, 1887, paid to the administrator of the estate of Olvera the balance of the purchase price of the land ($20,452.50), and caused a deed for the land to be executed by the administrator to Forbes, in pursuance of the order confirming the sale. After making this payment, there remained in his hands, of moneys paid him as aforesaid by the persons last above named, $6,247.50. Deducting from this the ten per cent originally paid by defendants on Forbes's bid, there remained in Childress's hands $3,975 after paying the whole purchase price of the land.

On July 19th, Flash and Childress entered into a written agreement, reciting their several relations to the transactions above stated, and agreeing, among other things, that Childress should act as trustee for Flash in all matters pertaining to the land transactions until all the purchase-money should be paid by the corporation, and should also act as trustee for the corporation.

On July 20th, Forbes conveyed the land to Childress as trustee for the corporation, and on the same day the corporation made its promissory notes for the unpaid balance of the purchase-money (seventy-five thousand dollars), payable in one and two years to "A. D. Childress, trustee, or order," with interest at eight per cent per annum; and to secure these notes the corporation, on the same day, executed a mortgage on the land to "A. D. Childress, trustee." The notes were antedated to May 31st. It does not appear on the face of the mortgage or notes for whom Childress was trustee, but the court found that he held the notes and mortgage for himself and Flash, — Forbes having theretofore assigned all his interest to them.

On January 28, 1889, on his own motion, Childress conveyed the legal title of the land to the corporation, and about the same time assigned the notes and mortgage to Flash, but, to the extent of his interest, in trust for himself.

On February 18, 1889, Flash commenced the action

to foreclose the mortgage; and on April 5, 1889, a decree of foreclosure was entered by default for the sum of $88,875.61, including $2,500 for attorney's fees.

On May 4, 1889, the mortgaged land was sold by the sheriff, under the decree of foreclosure, to Flash, for the sum of $31,500, leaving a deficiency of $58,126.14, for which a judgment was docketed in favor of Flash, against the corporation. The sheriff executed a deed to Flash, November 8, 1889.

The fraudulent acts by which the corporation was induced to purchase the land and to execute the notes and mortgage, as found by the court, are substantially as follows: That the defendants, by their agents, Wilson and Coleman, for the purpose of inducing Mackey, Montgomery, Thomas, La Tourette, and Flower, Jones & Co. to subscribe the agreement of May 20th, and to subscribe for stock in the corporation, represented to them that Forbes and Flash held a contract for the purchase of four thousand five hundred acres of land from the estate of Olvera, deceased, at the price of twenty-five dollars per acre, which price was the lowest figures for which the land could be purchased; that those who would subscribe the agreement of May 20th would get in "on the ground-floor, at bed-rock figures"; that a corporation was to be immediately formed for the completion of the purchase under the said contract held by Forbes and Flash, and upon the organization of the corporation, shares of the capital stock would be issued to the subscribers of the agreement in proportion to their subscription; and that all such representations were willfully false, except that Forbes and Flash held a contract for the purchase of the land; that defendants, by their said agents, fraudulently concealed from the subscribers last above named that the contract price of said land was only $5.05 per acre, and also concealed the facts that Childress was interested with Forbes and Flash in said contract of purchase from the estate of Olvera, that Forbes and Flash were interested with Childress in his subscription to the agreement of May

20th, and that Wilson and Coleman were agents of defendants and Forbes to make the sale to the corporation, for which they were to be paid a commission; that although the subscriber Outhwaite was informed by Coleman that Childress was interested with Forbes and Flash in the contract to purchase the land from the estate of Olvera at $5.05 per acre, defendants, by their said agents, fraudulently concealed from him the facts that Wilson and Coleman were agents for the real sellers, and were to be paid said commission, and falsely represented to him that he was being admitted to the company on an equal footing with all other members thereof. While no express misrepresentations were made to the subscriber Baker, defendants fraudulently concealed from him the facts that Childress was interested with Forbes and Flash as a seller of the land to the corporation, and that Wilson and Coleman were agents of defendants, and as such were to be paid said commission. That each of the above-named subscribers, to wit, Mackey, Montgomery, Thomas, La Tourette, Flower, Jones & Co., Outhwaite, and Baker, believed all the false representations made to him, and none of them had any notice of the facts concealed as aforesaid, nor of the falsity of said representations, until long after the foreclosure sale; and that by reason of said false representations and concealment of facts, each of them was induced to subscribe the agreement of May 20th, and to join in the organization of the corporation; that the directors of the corporation were five in number, and from the organization of the corporation until September 28, 1889, consisted of Childress, Wilson, Coleman, Thomas, and Mackey, and during all that period the corporation was under the control of Childress, Wilson, and Coleman, who, with notice of all the aforesaid fraudulent acts and concealments, willfully and fraudulently permitted said judgment of foreclosure to be taken by default.

This action was commenced on December 17, 1889,

one month and nine days after the execution of the sheriff's deed to Flash.

1. Counsel for appellants contend that the findings of fact show no cause of action in favor of plaintiff, for the reason that the frauds found were committed, not against the corporation, but only against the individual subscribers to the agreement of May 20, 1887, who, by virtue of that agreement, became the purchasers of the land, and subsequently conveyed it to the plaintiff, but did not assign to the plaintiff their rights of action for fraud in the sale of the land to them.

I think counsel are mistaken in contending that the agreement of May 20th is a contract of purchase, in any proper sense of the term. No party to it purports to be seller, or agrees to sell. All are represented as agreeing with each other to purchase the land, but from whom they propose to purchase is not expressed or implied in the written agreement. The agreement as written imposes no obligation upon the owner of the land in favor of the subscribers, nor upon the subscribers in favor of such owner.

From other evidence than the subscription agreement, however, the court found that it was never the intention of the subscribers, or any of them, to purchase the land, but merely to take stock in a corporation thereafter to be organized by the subscribers which should purchase the land from the estate of Olvera, or complete a purchase thereof under the contract held by Forbes and Flash, such stock to be issued to them in proportion to their subscriptions, it being an expressed and well-understood condition of their subscriptions that such corporation should be organized to make the purchase. Childress, who represented Flash, demanded this condition, as he would not personally sign the notes and mortgage for the deferred payments; nor would Thomas subscribe without this condition. All the subscribers were informed by Wilson and Coleman, before they subscribed, that a corporation would immediately be organized to make the purchase of the

land, and that they would receive shares of the capital stock for their subscriptions. Indeed, their subscriptions were intended to be, and were substantially, subscriptions for stock of the corporation, though more formally repeated on June 4th, when the corporation came to be organized.

At the time the corporation was organized, Childress, Flash, and Forbes were still the owners of the contract to purchase from the administrator of the estate of Olvera, made in the name of Forbes; and two days thereafter (June 5th), Forbes, who was not then known, except to defendants and their agents, to be interested in the transaction, recorded the order of the probate court confirming the administrator's sale to him. On July 16th the administrator's deed was executed to Forbes, for the use of Childress, Flash, and himself. On July 20th the purchase of the land by the corporation, ostensibly from Forbes, but really from Childress, Forbes, and Flash, was consummated by a conveyance from Forbes to Childress, trustee for the corporation, in consideration of thirty-seven thousand five hundred dollars in cash, and the notes of the corporation then made to Flash, as trustee for Forbes, Flash, and Childress, for seventy-five thousand dollars, secured by the mortgage of the corporation as above stated. The thirty-seven thousand five hundred dollars cash paid was the money of the corporation theretofore advanced by the subscribers, as aforesaid, through Childress, their trustee, in payment for their stock in the corporation. Such having been the real nature of the transactions, dressed in gauzy disguise, no doubt the corporation .purchased immediately from the defendants and Forbes. That the defendants so understood it is further evinced by the agreement between them of July 19, 1887, and the letter of Childress to the corporation dated January 5, 1889.

The defendants, by their agents, Wilson and Coleman, and otherwise, were evidently promoters of the corporation to purchase their own property. A promoter of a corporation is defined by Mr. Morawetz. (sec. 545) to

be "a person who, by his active endeavors, assists in procuring the formation of a company, and the subscription of its shares. . . . . The word 'promoter' has no technical legal meaning, and applies to any person who takes an active part in inducing the formation of a company, whether he afterwards becomes connected with the company or not."

The definition given in Cook on Stocks and Stockholders (sec. 651) is as follows: "A promoter is one who brings about the incorporation and organization of a corporation. He brings together the persons who become interested in the enterprise, aids in procuring subscriptions, and sets in motion the machinery which looks to the formation of a corporation. A promoter is considered in law as occupying a fiduciary relationship towards the corporation."

"The subscriptions of the share-holders are made upon the trust that the promoters are men of rectitude and business sagacity, who will use their knowledge and exercise their control over the enterprise for the benefit of the company. . . . . Justice demands that the promoters of a company should not abuse the confidence placed in them by the subscribers for shares, or derive any unjust advantage through their control over the organization or management of the company." (Morawetz on Corporations, sec. 545.)

Again, at section 546, the same author says: "Accordingly, it has been held that if persons start a company, and induce others to subscribe for shares for the purpose of selling property to the company when organized, they must faithfully disclose all facts relating to the property which would influence those who form the company in deciding upon the judiciousness of the purchase. If the promoters are guilty of any misrepresentation of facts or suppression of truth in relation to the character and value of the property or their personal interest in the proposed sale, the company will be entitled to set aside the transaction, or recover compensation for any loss which it has suffered."

The above quotations are well supported by authority, the principal and leading case being that of *New Sombrero Phosphate Co.* v. *Erlanger*, L. R. 5 Ch. Div. 73; affirmed by the house of lords in 1878 (L. R. 3 App. C. 1218), a synopsis of which is given in Morawetz on Corporations, at section 291.   (See also *In re British Seamless Paper Box Co.*, L. R. 17 Ch. Div. 467; *Phosphate Sewage Co.* v. *Hartmont*, L. R. 5 Ch. Div. 394; *McElhenny's Appeal*, 61 Pa. St. 188; *Simons* v. *Vulcan O. & M. Co.*, 61 Pa. St. 202; 100 Am. Dec. 628; *Getty* v. *Devlin*, 54 N. Y. 403; *Pittsburgh Min. Co.* v. *Spooner*, 74 Wis. 307; 17 Am. St. Rep. 149, with note.

It therefore appears that the corporation was the party directly injured by the fraud, and was the proper party to bring this action.

2. While admitting that Wilson and Coleman were promoters of the corporation, counsel for appellants contend that the finding that they were authorized by the defendants to promote the corporation is not justified by the evidence.

That Wilson and Coleman were the authorized agents of defendants and Forbes to sell the land, and were to be paid a large commission for their services, there is no doubt.   The agreement of May 26th as to the amount and manner of payment of their commission would be nonsense on any other supposition.   A large portion of the commission (twelve thousand five hundred dollars) was to be paid in notes of "the *company purchasing*," which notes were understood to be the notes of an *incorporated* company, and not the notes of the persons who subscribed the agreement of May 20th, since Childress, who subscribed that agreement for himself and Flash, had made it a condition of his subscription that he was not individually to sign notes for the deferred payments of the purchase-money, but that a corporation should be formed to purchase the land and to make the notes for the purchase-money.   The reason he assigned for this was, that, being a banker, his credit might be injured by signing such notes individually.

The evidence certainly tends to prove that the promotion of the corporation was an essential part of the scheme designed by and for the benefit of all the conspirators, including the defendants, and that Wilson and Coleman were authorized to execute the scheme. Childress, for himself and Flash, subscribed for one fifth of the capital stock of the contemplated corporation two weeks in advance of its organization. If the authority of Wilson and Coleman to sell to the particular corporation to be promoted by them for the benefit of defendants did not imply authority from the defendants to promote the corporation, it had sufficient tendency, in connection with other evidence, to prove it, to justify the finding of such authority by the court.

Under this head, counsel also contend that the agreement of May 8, 1887, was a contract of sale of the land from Forbes, Flash, and Childress to Wilson, but the finding of the court that it was not is fully justified by the evidence. Coleman testified that when it was presented to him by Childress, in the absence of Wilson, he protested against signing it for Wilson, for the reason that he had no specific authority to do so; and that he would not have signed Wilson's name if he had not understood that it would not be enforced against Wilson. Wilson testified that he was dissatisfied with it, and withdrew it. Besides, it is inconsistent with the agreement of May 26, 1887, in regard to the commission to be paid to Wilson and Coleman. It was evidently prepared by Childress for the purpose of concealing his interest as a seller to the contemplated corporation.

Again, counsel have made extracts from the findings and complaint, in which the subscribers of the agreement of May 20, 1887, are carelessly designated as *purchasers;* but, read in connection with their context, these expressions cannot be understood to mean that the subscribers of the agreement of May 20th purchased the land, except in the sense that their purchase of capital stock of the corporation gave them an interest in the land purchased by the corporation.

Appellants have specified more than twenty particulars, in which they claim that the findings are not justified by the evidence, none of which are material, except such as relate to the agency of Wilson and Coleman and to the contract of May 8, 1887, which have been answered. If the evidence justifies the finding that in promoting the corporation Wilson and Coleman represented the defendants as well as themselves, and the finding that the alleged agreement of May 8th was a sham, then the finding of all other facts herein stated are fully justified.

3. There is nothing worthy of special consideration in the points to the effect that the court erred in admitting evidence objected to by defendants' counsel, except to say, that Wilson and Coleman having represented the defendants in promoting the corporation, what they said to induce subscriptions to the agreement of May 20th was competent evidence against their co-conspirators.

4. Appellants contend that the plaintiff is barred by its own laches, especially in that it neglected to move the court in which the foreclosure was had to set aside the judgment of foreclosure within six months after its rendition, upon which motion, it is claimed, the plaintiff could have obtained all the relief to which it is entitled in this action.

But I think this point is not maintainable, even on the facts as claimed by appellants, viz., that the defrauded stockholders had general notice of the fraud on June 5, 1889, — one month after the foreclosure sale, — and within the month of June consulted a lawyer as to their rights and remedies, and thence had more than four months within which to make their motion, under section 473 of the Code of Civil Procedure, to set aside the judgment. While it may be true that they had notice on June 5th that they had been defrauded, and generally of the mode and means by which the fraud had been perpetrated, yet it does not appear that they were then sufficiently informed as to the particulars, nor as

to the evidence by which the fraud might be proved in a court of justice. As yet, few, if any, of them knew how many of the stockholders had participated in the fraud, or where to apply for reliable information. Three of them resided in Los Angeles and three in San Diego, and it necessarily required considerable time to bring about unanimity and concert of action. It does not appear when they were first advised that the corporation was the proper party to sue, but it must have been after they were so advised that they determined to get control of the corporation at the next ensuing annual stockholders' meeting, to be held September 28, 1889, by electing a new board of directors. There was no reasonable prospect of their getting control of the corporation before the regular annual meeting, by means of a called special meeting of the stockholders under section 310 of the Civil Code; since no director could have been ousted at such special meeting, except by a vote of the stockholders owning two thirds of the capital stock, and the fraudulent stockholders held four tenths of the stock. In answer to this, counsel for appellants say Wilson would have voted with the innocent stockholders; but this is only an inference of counsel, drawn from the facts that Wilson consulted with plaintiff's counsel in the latter part of June, and testified on the trial to the facts constituting the fraud. It does not appear when Wilson first fully disclosed to the innocent stockholders the facts to which he testified on the trial; and admitting that he did so in the latter part of June, 1889, it does not follow that the innocent stockholders could then have relied upon his voting with them to oust from the office of director his co-conspirators in the fraud.

At the annual meeting of September 28, 1889, a new board of directors was elected, constituted of Thomas, Montgomery, Mackey, La Tourette, and Wilson, the first four of whom were of the victimized stockholders; and on the same day the new board adopted a resolution authorizing and directing the commencement of this

action, which was commenced two months and nineteen days thereafter. The new board of directors was elected only seven days before the expiration of the six months, within which it is contended a motion to set aside the judgment of foreclosure must have been made, under section 473 of the Code of Civil Procedure.

But a more conclusive answer to appellants' contention as to the six months' limitation is, that none of the grounds upon which a party may be relieved from a judgment under section 473 of the Code of Civil Procedure appear to have existed in this case. The judgment was not taken against the corporation through its "mistake, inadvertence, surprise, or excusable neglect," but through the fraud of its directors, in aid of the original fraud by which the notes and mortgage were procured. Having notice of the original fraud constituting a meritorious defense to the foreclosure action, a majority of the directors—Childress, Wilson, and Coleman—purposely, willfully, and fraudulently permitted the judgment to be taken by default. There was no mistake, no inadvertence, no surprise, and no excusable neglect. Therefore, conceding, as I do, that the judgment and default might have been set aside, and leave to answer obtained on motion, on the ground of fraud, independently of section 473 of the Code of Civil Procedure, yet such motion was not subject to the six months' limitation prescribed by that section of the code. Nor was the remedy by motion on the ground of fraud exclusive of the remedy by regular suit in equity, unless it was pefectly adequate. (*Baker* v. *O'Riordan*, 65 Cal. 368.) The only relief to which the corporation would have been entitled on such motion was the setting aside of the judgment and default, with leave to answer, which would have been but one step circuitously leading to the same equitable relief which has been directly obtained by this suit. The very next step must have been the commencement of a distinct suit in equity, which, though called a cross-suit, commenced by a cross-complaint, would have been, in fact and sub-

stance, the same as this suit; and I am unable to perceive why, on the score of equitable jurisdiction, such cross-suit would have been less objectionable than this suit.

Should it be claimed that the corporation might have obtained complete and adequate relief in the foreclosure suit by simple answer without a cross-complaint, the answer is, that adequate and complete relief embraced the cancellation of the notes and mortgage, and possibly more, which is affirmative equitable relief that could not have been obtained without a cross-complaint in the foreclosure suit, or a separate suit in equity.

It only remains, under this head, to consider the effect of the delay of the commencement of this action, independently of the six months' limitation prescribed by section 473 of the Code of Civil Procedure. Was such delay, under the circumstances of the case, sufficient to bar the remedy?

The mere lapse of time less than the statutory period of limitation will not bar an action for equitable relief, unless the delay, under the circumstances, has been such as to justify the presumption that the defendant *may* have been prejudiced thereby. The bar of an equitable remedy in such cases is not imposed upon the plaintiff as a penalty for his negligence, but is intended merely to protect the defendant from such consequences of the delay as may be prejudicial to his rights. In the case of *New Sombrero Phosphate Co.* v. *Erlanger*, L. R. 3 App. Cas. 1230, it was contended that the remedy was barred by laches of the complainant, similar to such as claimed in this case, but the delay was held to be insufficient. Speaking to this point, Lord Penzance said: "The nearest approach to a definition of the equitable doctrine upon this head which is to be found amongst the cases cited is the statement made in the case of *Lindsay Petroleum Co.* v. *Hurd*, L. R. 5 P. C. 221. Delay is there said to be 'material, where it would be practically unjust to give a remedy, either because the party has, by his conduct, done that which might fairly be re-

garded as equivalent to a waiver of it, or where, by his conduct and neglect, he has, though perhaps not waiving that remedy, yet put the other party in a situation in which it would not be reasonable to place him if the remedy were to be afterwards asserted.' . . . . It conduces, I think, to clearness, and to the exclusion of a certain vagueness which is apt to hang about this doctrine of delay as a bar to relief, to keep these two different aspects of it separate and distinct when the consequences of delay come to be considered in connection with the circumstances of an individual case."

Nothing of the facts or circumstances of this case indicates acquiescence of the defrauded stockholders in the wrongs complained of or a waiver of their rights. Nor was the situation of the defendants or the condition of the property so changed during or in consequence of the delay as to cause the judgment rendered against them to be more onerous than it should have been if the action had been commenced in June instead of December, 1889. Nor can the presumption be indulged that evidence which would have been beneficial to defendants might have been lost in consequence of the delay, since all persons who participated in or appear to have had any knowledge of the transactions were living and testified at the trial, and all documents claimed to be material for the defense were produced. Another important circumstance in this connection is, that during the first six months after the rendition of the judgment the plaintiff corporation was under the control of the defendants and their associates in the fraud, and therefore, to say the least, it would seem unjust that they should be heard to complain of laches of the plaintiff during that period, or of delay on the part of the defrauded stockholders in ousting them from the position of trust which they had taken and held for the purposes of promoting the fraud and obstructing any remedy therefor.

Considering all the facts and circumstances, I think

it does not appear that the trial court erred in holding the suit not barred by laches of the plaintiff.

5. Counsel for appellants further contend " that the findings do not support the judgment, for the reason that Childress and Flash bought the land for themselves, and on their own account, before the corporation was formed, or any steps taken towards its formation."

It is not claimed, however, that for this reason there was no fraud, nor that the corporation was not entitled to some species of relief, but only that " the remedy allowed by the court — ' secret profits ' — is inapplicable, because Childress and Flash, even conceding them to have been promoters of the corporation from the time the first steps were taken towards its formation, were not promoters at the time of the original purchase from the Olvera estate."

Counsel say, under this head: " The point is this: Conceding misrepresentations as to the price paid the Olvera estate, as well as concealment of Childress's ownership, and that these things were fraudulent and actionable, still, inasmuch as there was no agency when defendants and Forbes bought from the Olvera estate, the recovery of ' secret profits ' was not authorized or appropriate relief."

By this I understood counsel to mean that there was no confidential or fiduciary relation between the defendants and the corporation in respect to the contract of purchase from the estate at the time it was made.   Conceding this, it is found by the court, and for the purpose of this point is admitted by counsel, that the defendants afterwards placed themselves in a fiduciary relation to the corporation by promoting it, and while in that relation, by means of the fraudulent ·representations and concealments found, induced the corporation to purchase their land, whereby they made "secret profits " exceeding seventy-five thousand dollars.   Admitting, for the sake of argument, that the relief granted (the canceling of the notes and mortgage) was equivalent to a recovery of secret profits fraudulently made, in what

respect is the relief inappropriate? Surely, it does no injustice to defendants, since it appears that the amount recovered is nearly four thousand dollars less than their cash profits, besides one fifth of the stock of the corporation, which they still retain, for which they paid nothing. Their co-conspirators — Wilson and Coleman — also retain one fifth of the stock, which is a part of the fraudulent profits, while the defrauded stockholders have only three fifths of the stock for the thirty-seven thousand five hundred dollars paid by them. Assuming that the price for which the land sold at the foreclosure sale (thirty-one thousand five hundred dollars) was equal to its value, and that the corporation has no other property than the land, the innocent stockholders have lost eighteen thousand six hundred dollars by the transaction, while the defendants and their co-conspirators have gained twelve thousand six hundred dollars, notwithstanding the relief granted to the .corporation. These results may be accounted for by the facts, — 1. That the relief granted to the corporation was not equivalent to a recovery of *all* the fraudulent profits; and 2. That the relief granted to the corporation necessarily operated in favor of all the stockholders equally. Yet it does not follow from these results that the corporation was not entitled to the relief granted.

An objection to the recovery of secret fraudulent profits similar to the objection under consideration was answered in the case of *Getty* v. *Devlin*, 54 N. Y. 412. In that case, the subscribers to a paper agreed jointly, and for their mutual benefit, to purchase certain lands for a specified price. The court said: " No one of the subscribers could, after this, purchase the lands for a less price, and compel his associates to allow him more than he paid. His purchase would inure to the benefit of all the subscribers. That this is so is so thoroughly settled, both upon principle and authority, that it will not be disputed. . . . . If this be so as to a purchase made after the subscriptions are written, why should not

the same rule be applied to a purchase made before? The wrong and breach of faith is just as great, and every reason and authority showing that the rule should be applied in one case would show that it should be applied in the other. *Bentley* v. *Craven*, 18 Beav. 75, is an authority quite in point."

I think this is a satisfactory answer to appellants' point grounded on the fact that defendants purchased the land from the estate of Olvera before the date of the subscription agreement of May 20th.

It is suggested that just and appropriate relief could have been granted only by a rescission of the sale and restoration of the land to the defendants, as in the Sombrero case, *supra*.

Conceding that such rescission would have been a practicable mode of relief, I do not think it exclusive of any other mode by which a court of equity might have given appropriate relief, doing no injustice to the defendants.    But it does not appear that such rescission and restoration of the parties to their original *status* was practicable, or desired by the defendants; nor does it appear that it would have been less onerous upon the defendants, as above shown.    The land should not have been restored to defendants unless they were able to refund all the money which they and their associates in the fraud had wrongfully obtained from the corporation, and caused it to expend, with interest, which must have amounted to more than forty thousand dollars. Were the defendants solvent, independently of the land? If not, could forty thousand dollars have been realized from the land?    These and perhaps other difficult questions must have been solved before it could have been determined whether rescission was the proper or even practicable mode of relief.    Had the defendants requested that mode, and tendered payment of the requisite sum of money in the court below, they would be in a more favorable position to advocate this point here.

6. The point is made, that the effect of the decree is more favorable to Wilson and Coleman than to defend-

ants, since they retain both their stock in the corporation and their large commissions.

In answer to this, it is enough to say that it is a matter that does not concern the corporation. It concerns only the defendants and their co-conspirators in the fraud, and must be adjusted, if at all, among themselves. As before remarked, the relief granted to the corporation is equally favorable to all the stockholders. The grievances of individual stockholders suffered from the wrongs of other stockholders could not have been redressed in this action.

I think the judgment and order should be affirmed.

BELCHER, C., and SEARLS, C., concurred.

For the reasons given in the foregoing opinion, the judgment and order are affirmed.

HARRISON, J., GAROUTTE, J., McFARLAND, J.

Hearing in Bank denied.