[L. A. No. 2096. Department One.—July 6, 1908.]

LOMITA LAND AND WATER COMPANY (a Corporation), Appellant and Respondent, v. F. E. ROBINSON, and BEN WHITLOCK, Appellants and Respondents, and A. C. FREEMAN, and J. C. CLINE, Respondents.

CORPORATIONS—LIABILITY OF PROMOTERS—DUTY TO DISCLOSE PROFITS.— Promoters of a corporation formed for the express purpose of purchasing a particular piece of property, occupy a fiduciary relation to their co-subscribers, and are bound to truthfully declare to their associates any personal interest they may have in the matter of the

purchase. Without such disclosure they cannot legally profit at the expense of their associates, and if they were guilty of any misrepresentation of facts or suppression of truth in relation to their personal interest in the proposed purchase, the corporation is entitled to set aside the transaction, or recover compensation for any loss which it has suffered. And one of such guilty promoters cannot absolve himself from liability for such loss by returning his share of such secret profits.

ID.—LIABILITY OF ONE CONSPIRING WITH PROMOTERS.—All persons who conspire with the promoters of a corporation to induce it to purchase property at a price out of which they receive secret profits, and willfully aid in the execution of the transaction, are jointly liable to the corporation for the ensuing injury, irrespective of the degree of their culpability, although they may not originally have been parties to the fraudulent scheme, and may not have shared at all in the profits of the fraud.

ID.—FINDINGS—KNOWLEDGE OF SECRET PROFITS BY CONSPIRATOR.—In the present case it is held that knowledge by one of the defendants of the fact that the promoters of the plaintiff corporation were obtaining secret profits is sufficiently shown by the findings, especially by the findings to the effect that such defendant gave a false receipt acknowledging the receipt on account of the purchase price of an amount in excess of that actually received by him, and the further finding that by signing such receipt "he aided and abetted" his co-defendants in their fraudulent scheme.

ID.—ABETTOR OF FRAUDULENT PROMOTER IN OBTAINING SUBSCRIPTIONS.— One who with full knowledge that the promoters of such corporation are to obtain secret profits from the sale of the property to the corporation aids and abets them in securing subscriptions to the agreement for the formation of the corporation, which agreement falsely states the price at which the property is to be acquired, is jointly liable with such promoters for the secret profits realized by them, irrespective of his motives.

ID.—PROFITS FROM PROMOTION, WHEN LAWFUL—DISCLOSURE TO ASSO-CIATES.—One who holds an option for the purchase of land at a specific price is not guilty of any wrong-doing in associating himself with others in the formation of a corporation to purchase the land at an enhanced price, and in effecting such sale to the corporation, if the fact that he was making a profit out of the transaction was known to his associates. If the subscribers to the agreement for the formation of the corporation knew that he was making a profit, the mere fact that they did not know the amount thereof will not entitle them to complain, in the absence of some misrepresentation in the matter.

ID.—LIABILITY OF ASSOCIATES AS BETWEEN THEMSELVES—ONE CANNOT PROFIT AT EXPENSE OF OTHERS.—One who associates himself with others in an undertaking for the purchase of property for their common benefit, assumes a relation analogous to that existing be-

tween partners, and is precluded from making any secret profit out of the contemplated purchase at their expense, and will be held as a trustee for any profits so obtained. And this is so, although the profits made by such associate were paid him in pursuance of an understanding had prior to his becoming such associate with the person having the property for sale. The fact that some but not all of his associates knew or supposed that he was making a profit will not relieve him from liability.

ID.—LIABILITY OF FRAUDULENT PROMOTERS THAT OF JOINT TORT-FEASORS —CANCELLATION OF NOTE GIVEN AS PART OF EXCESS PRICE.—All who join in such a scheme to defraud the corporation so intended to be formed, by the acquisition of secret profits, are liable as joint tort-feasors, and one of them to whom a promissory note has been given as part of the excess purchase price paid by the corporation cannot complain of a judgment directing the cancellation of the note, although the effect of such cancellation would be, under the agreement between the tort-feasors, to compel him to pay more than his proportion of the profits wrongfully realized by them.

COSTS OF TAKING DEPOSITIONS, WHEN ALLOWABLE.—A plaintiff has the right to have the depositions of the defendants taken, and is entitled to recover the costs thereof if it was necessary to take them. The trial court, however, has power to disallow such costs if it appears to it that such taking could not under the circumstances be necessary to the protection of his rights.

ID.—APPEAL—ORDER DISALLOWING COST OF DEPOSITIONS—PRESUMPTION OF WANT OF NECESSITY.—On an appeal from an order taxing plaintiffs costs and striking from the memorandum thereof items for the costs of taking the depositions of the defendants before the trial, the motion for which was based on the ground that the taking of the depositions was unnecessary, and which was made on all the records and papers on file in the action, it must be presumed, in the absence of any record on appeal except the judgment-roll, and in support of the order, that the evidence before the trial court on the hearing of the motion, consisting of all the files, records, and papers in the case, warranted the conclusion that the taking of the depositions was unnecessary.

ID.—MOTION TO RETAX—AFFIDAVIT UNNECESSARY.—It is not essential that a motion to retax costs should be accompanied by any affidavit.

APPEALS from a judgment of the Superior Court of Los Angeles County and an appeal from an order taxing plaintiff's costs. Walter Bordwell, Judge.

The facts are stated in the opinion of the court.

Hunsaker & Britt, for Plaintiff and Appellant.

W. R. Bacon, and Denis & Loewenthal, for Defendant and Appellant Robinson.

Porter, Sutton & Cruickshank, for Defendant and Appellant Whitlock.

Percy R. Wilson, for Defendant and Respondent Cline.

Milton K. Young, for Defendant and Respondent Freeman.

ANGELLOTTI, J.—This is an action brought by a corporation organized under the laws of this state to recover from four of the original subscribers to the stock thereof, certain alleged secret profits realized by them on a sale of a tract of land to such corporation.

There are appeals by different parties from the judgment. The case comes before us on the judgment-roll alone, and the question presented by all the appeals is as to the sufficiency of the findings to sustain the judgment.

The findings show the facts, so far as material, to be as follows:—

The land involved consists of some seven hundred acres of land in Los Angeles County, valuable both for farming purposes and the purposes of a gun club and duck preserve. It was held, subject to a mortgage for eighteen thousand dollars, by several persons, of whom Robinson was one. Under these circumstances, Robinson employed defendant Whitlock to find a purchaser therefor without fixing any price.

Sometime prior to July 5, 1903, Whitlock interested defendant Freeman in the matter of the purchase of the property, and induced him to examine the same. At Freeman's request, defendant Cline examined the property, in company with Freeman and Robinson, and pronounced it suitable to the uses of a gun club as a duck preserve. On July 5, 1903, Freeman paid Robinson five hundred dollars for an option to purchase said property within thirty days. No price was then agreed on, and Robinson gave Freeman a receipt for the money, stating therein that the same was "in payment for an option for 30 days on approximately seven hundred acres of the Rancho La Bolsa Chica, which said option is to be executed by me as soon hereafter as same can be formally drawn from

description to be by me furnished," and that such five hundred dollars was to be applied on price to be specified therein.

Subsequent to this, Robinson's associates in the property gave to him a written authorization to sell the property for $27,500 net, dated July 5, 1903, stating therein: "You may have thirty days from the 5th inst. to close the sale. It is further understood that you are to deposit in the American National Bank of Long Beach the sum of five hundred dollars for this option, which money will be applied on the purchase price if the sale be accepted, otherwise to be paid to us as a forfeit." Robinson, upon obtaining this authorization or option, entered into an arrangement with Whitlock that he "would fix the purchase price of the said real property to defendant Freeman at the sum of $33,000, of which Whitlock should receive as his compensation for finding a purchaser, . . . the sum of $3,000, and that defendant Robinson should have and retain the balance of $30,000." Early in August, 1903, the so-called option of July 5, 1903, given Freeman by Robinson, was in writing extended until August 25, 1903, and it was stated in such writing that the price agreed on was thirty-three thousand dollars.

In the mean time, Freeman and Cline had commenced and were engaged in efforts to form a corporation to take this property for the purposes of a gun club. It is not found that Robinson knew anything about their plans or efforts in this direction until after he had definitely agreed in writing with Freeman as to the price for which Freeman might purchase the property, or that he had anything whatever to do with the formation of the corporation, other than to become a subscriber for one share therein. At the instance of Freeman, a written instrument in the nature of a subscription agreement was prepared by one Paul W. Schenck, dated July 14, 1903, reading as follows:—

"Whereas, F. E. Robinson, one of the undersigned, is the owner of an option to purchase a certain portion of the Rancho La Bolsa Chica, in the county of Los Angeles, . . . and comprising between 600 and 700 acres of said Rancho, and,

"Whereas, it is proposed to form a gun club corporation, . . . and by such formation secure for its members the land aforesaid for the sum of $39,500, payable $14,500 cash and the balance in installments extending over a period of 9 years, therefor,

"The undersigned, each for himself, does hereby subscribe for one share and agree with every and all other subscribers hereto as follows:—

"1st. Within five days hereafter to pay to A. C. Freeman in trust, for the purposes herein set forth, the sum of $500 on each such share as the initial payment thereon. . . .

"This agreement is made contingent upon securing subscriptions for the total 36 shares, and if they be not so secured within 30 days, all money so paid in in trust to be refunded."

Prior to August 25, 1903, this agreement was signed by thirty-six men for one share each, including each of the defendants, Robinson's name being the thirteenth signed, and Whitlock's the fourteenth. Prior to July 5, 1903, Robinson had stated to Whitlock that he wanted to be a member of the gun club, and Whitlock signed the name of Robinson to the subscription agreement, assuming that he had authority to do so, and informed Robinson thereof some time prior to August 25th, and Robinson ratified Whitlock's act. Most of the subscribers were obtained by Freeman and Cline, but Whitlock obtained two, Messrs. Hickcox and Dotter. Robinson never saw the agreement until after this action was commenced, but on August 25th was informed as to the statement made therein concerning the price at which the property was to be sold to the corporation. None of the persons who signed the subscription agreement, except the defendants and S. Schenck, Paul W. Schenck, George C. Dotter and Ross T. Hickcox, ever was informed or had any knowledge that either Whitlock, Freeman, or Cline, or any subscriber "other than said Robinson," was to receive any part of the thirty-nine thousand five hundred dollars mentioned in the agreement, or that any subscriber "other than said Robinson" was in any way interested therein other than as a subscriber. All that Dotter and Hickcox knew was that Whitlock had at one time urged them to form a gun club to purchase the property, saying that he had it for sale at a probable price of about thirty thousand dollars or thirty-three thousand dollars, and they supposed when they signed the agreement that he was making some profit out of the matter. The Schencks were partners and confidential business associates of Freeman. No subscribers other than defendants and the Schencks ever were informed or knew the price Robinson was to pay for the property.

On August 25, 1903, by the direction of Freeman, an agreement for the sale of the property to the subscribers was executed by Freeman with Paul W. Schenck, as trustee for the subscribers. The consideration for the sale named therein was $39,500, the property to be taken for $21,500, subject to the $18,000 mortgage, which was assumed by Schenck as trustee. It was stipulated therein that of the $21,500, $14,500 cash was to be paid on the execution of the agreement, $5,000 one year from date, and $2,000 eighteen months from date, interest at nine per cent to be paid on deferred payments. Thereupon, Freeman paid to Robinson from moneys in his hands received from the subscribers, the sum of $7,000, which with the $500 due from Robinson on the subscription agreement and the $500 theretofore paid by Freeman to Robinson for the option, made a total payment of $8,000. Robinson then gave Freeman, at his request, a written receipt for $14,500, as follows:—

"LOS ANGELES, Cal., Aug. 25, 1903.
"Received of A. C. Freeman, fourteen thousand five hundred dollars, first payment on gun club grounds.
"$14,500.                                        F. E. ROBINSON."

Of the $6,500 thus receipted for, but not paid, Freeman retained for his own use $2,600, and paid to Cline $1,300, to Sam Schenck $1,300, and to Paul W. Schenck $1,300. Cline subsequently returned his $1,300 to Freeman, as did also Sam Schenck. Robinson paid to Whitlock from the money received by him the sum of $3,000 for his services, and this left him, including the moneys still due him under the contract, a profit of $2,500 on the transaction.

Pursuant to the subscription agreement, plaintiff was organized as a corporation by the subscribers, and on April 9, 1904, said Schenck, trustee, transferred to it the agreement of purchase. On August 25, 1904, plaintiff paid Robinson under said agreement $5,490, but has made no other payment except such installments of principal and interest as have become due on the subsisting mortgage. Robinson has acquired from his associates the legal title to the property.

Other facts were found by the trial court, but we deem the foregoing to be a fair statement of the material facts except in so far as we hereinafter specify other findings. It is important to bear in mind that, so far as the findings show, Rob-

inson had absolutely nothing to do with the matter of the formation of the corporation to purchase this property (except in subsequently agreeing to become a subscriber for a share of its stock), even to the extent of suggesting the organization of such a corporation.  The theory of the findings is that Robinson was dealing solely with Freeman, agreeing to sell the property *to him* for thirty-three thousand dollars, and that the scheme of a corporation to take over the property so to be acquired by Freeman was the scheme of Freeman and his associates, and that Robinson had nothing to do therewith. The opinion of the trial court rendered in deciding the case is no part of the record, but it is proper to state that it is in line with this construction, the learned judge stating emphatically that the evidence satisfied him that the intention of Robinson and Freeman was that Robinson was to sell the property to Freeman for thirty-three thousand dollars.

It is further important to bear in mind that the trial court did not find that the subscribers had not been informed or did not know that Robinson was to personally receive a portion of the thirty-nine thousand five hundred dollars, and was interested in the matter other than as a co-subscriber.  The lack of knowledge on the part of the subscribers as to such matter was limited by the findings to the other defendants.

It is further clear under the findings that Whitlock was Robinson's agent only so far as the sale of the property by Robinson to Freeman was concerned, and that the promotion by him of a corporation to purchase was not authorized by Robinson, and that anything he may have done in the matter of the formation of the corporation was not done as Robinson's agent and could not bind Robinson.  The facts found distinguish this case from that of *Ex-Mission etc. Co.* v. *Flash,* 97 Cal. 610, [32 Pac. 600], in this regard.

The trial court concluded that plaintiff was not entitled to recover the $5,500 difference between $27,500 and $33,000 received by Robinson, and of which Robinson had paid $3,000 to Whitlock.  As to the $6,500 difference between the price at which Freeman purchased from Robinson, $33,000, and the $39,500, for which the property was purchased by the subscribers to the stock of the proposed corporation, the court found that plaintiff was entitled to recover from Freeman and Cline, as secret profits realized by them as promoters of the

corporation from their co-subscribers, and also from Robinson and Whitlock, upon the theory that they had aided and abetted Freeman and Cline in their scheme to secretly increase the price of the property to their co-subscribers for their own benefit, Whitlock by procuring signers to the subscription agreement, and Robinson by making it appear in the agreement of sale that the price to be paid was $39,500 instead of $33,000, and by giving the receipt for $14,500, when in fact he received only $8,000. The trial court found as a fact that in this way Whitlock and Robinson aided and abetted Freeman and Cline in such scheme.

Judgment was accordingly given against all four defendants for the amount already paid by the subscribers and the corporation in excess of the amount which should have been paid,—viz., $4,500, with $490 interest, and decreeing the $2,000 and interest still to be paid Robinson under the terms of the contract not to be a valid claim against plaintiff, and directing Robinson to execute a conveyance of the property to plaintiff.

Plaintiff appeals from the judgment, claiming that it should have been awarded judgment against Robinson and Whitlock for the $5,500 difference between the $27,500 and the $33,000. Robinson and Whitlock each appeal from the judgment against them. There is no appeal on behalf of either Freeman or Cline.

1. As to defendants Freeman and Cline, the case, under the authorities, is, of course, a clear one so far as the six thousand five hundred dollars profit made by Freeman and shared by him in part with others is concerned. They were essentially promoters of the corporation formed for the avowed purpose of purchasing this property from one other than themselves, and they misrepresented to those whom they induced to join in the enterprise and who became with them subscribers to the stock of the proposed corporation, the amount the corporation would be required to pay in order to obtain the property, for the purpose of making six thousand five hundred dollars secret profit from the subscribers in the transaction, and this secret profit was in fact made. The findings show that their plan from the beginning was to form a corporation to purchase this property, and that they practically procured its formation.

As promoters of the corporation they occupied a fiduciary relation to their co-subscribers, and were bound to truthfully declare to their associates any personal interest that they had in the matter of the purchase. Without such disclosure they could not legally profit at the expense of their associates. If they were guilty of any misrepresentation of facts or suppression of truth in relation to their personal interest in the proposed purchase, the corporation is entitled to set aside the transaction, or recover compensation for any loss which it has suffered. (See *Ex-Mission etc. Co.* v. *Flash,* 97 Cal. 610, 626, [32 Pac. 600], and cases there cited.) In *Burbank* v. *Dennis,* 101 Cal. 90, 102, [35 Pac. 444], this court quoted approvingly the following: "The substance of the law is that promoters are corporate fiduciaries. Transactions with their companies wherein they deal honorably, with full disclosure, and without seeking to influence the action of the corporation will be upheld. But transactions in which they suppress or misrepresent material facts, or otherwise deceive the company, or corruptly control its action, are fraudulent, and the company may elect either wholly to set aside such transaction, or to recover the promoter's profits."

It should be noted, in justice to Cline, that when he learned that the subscribers were dissatisfied on account of these secret profits, he returned the thirteen hundred dollars given him to Freeman from whom he had received it. This, however, does not affect his liability in this case.

2. So far as such six thousand five hundred dollars secret profit is concerned, we think there can be no doubt that Robinson is also liable to plaintiff. In 1 Clark & Marshall on Private Corporations, at p. 327, it is said: "Persons who conspire with promoters of a corporation to induce it to purchase property at a certain price, upon the representation that it is a reasonable price, and the one which has been agreed to be paid to the owner, whereas it is greatly in excess of the sum agreed to be paid, are, equally with the promoters, liable for the secret profits made on the sale of the property to the corporation, although it is not alleged that such persons, other than the promoters, had any dealings with the corporation or its members, or occupied fiduciary relations towards them. . . . This is on the well-established principle that where several persons combine to carry out a fraudulent conspiracy to cheat

another, each and all of such persons are liable to the defrauded party, without reference to the amount of the fruits of the fraudulent transaction he obtains or the degree of his activity in the scheme." It is not essential to such a liability that such participant was originally a party to the contrivance of the fraud. If knowing the fraud contrived, he willfully aids in its execution, he thus becomes a party to the plan and is chargeable with the consequences. (See *Lincoln* v. *Chafflin*, 7 Wall. 138, [19 L. ed. 106].) All persons uniting or co-operating in such a wrong are jointly liable for the ensuing injury, irrespective of the degree of culpability. (See *Marriott* v. *Williams*, 152 Cal. 705, [93 Pac. 875], and cases there cited; 3 Cooley on Torts, 213; *More* v. *Finger*, 128 Cal. 319, [60 Pac. 933].) As said by the learned judge of the court below: "It is not necessary that the defendants shall have all been in league from the beginning to defraud the investors or any of them; they need not be *in pari delicto*. It is enough that each was at some time and in some degree a party to and aided the improper transaction and it matters not how unequal may have been the assistance rendered." Nor is it even essential that such a participant should have shared at all in the profits of the fraud. This is illustrated by the case of *Stoney Creek etc. Co.* v. *Smalley*, 111 Mich. 321, [69 N. W. 722], where the vendor of certain real property gave to the vendee at his request a receipt designed to show a larger consideration than was in fact to be paid, to enable the vendee to impose on his associates. The court said: "It is urged that Davis was not an agent of Smalley; that the latter did not authorize Davis to make any representations; that he was to have no interest in the corporation; had no partnership relations with Davis; that he was not concerned in and received no part of the purchase money for which the property was to be sold, above his original price of $2500. This defense cannot obtain. Smalley gave Davis a false paper. He knew it was false, and that it could not be used for any legitimate purpose. He knew that a fictitious consideration was stated in the deed. . . . Where one deliberately gives another a false statement in writing, knowing the purpose for which it is to be used, which that other uses to deceive a third party, he is a joint wrong-doer, and must be held responsible for the consequences which follow. Smalley cannot defend upon the ground that he received no benefit from the fraud."

It is urged that the findings do not show any knowledge on Robinson's part of any scheme on the part of Freeman to obtain a *secret* profit at the expense of the subscribers, and that without this element there is no basis for a conclusion that he was knowingly a party to the fraudulent scheme. In this connection, reliance is placed on the finding that "defendant Robinson did not on the 25th day of August, 1903, know what representations had theretofore been made by any of his co-defendants herein to the plaintiff, or its stockholders, or signers of said subscription agreement." This finding must, however, be read in connection with the other findings. From these, it appears that Robinson knew that the property was in fact being sold to persons who had been induced to subscribe to an agreement to form a corporation to acquire the property for gun club purposes, and that the subscription agreement presented to and signed by the subscribers contained the false representation that the price at which it was to be acquired was thirty-nine thousand five hundred dollars, when, in fact, he was selling it for not exceeding thirty-three thousand dollars. He then had knowledge of this false representation made in writing by those who were promoting the corporation. When he was requested to make his agreement for sale state the same false representations as to price, and was requested to give a false receipt for the excess that he was not to receive, it is incredible that he did not know that the object of the request was to obtain for Freeman and his immediate associates written evidence confirming the false representation theretofore made, and enabling them to conceal from their co-subscribers the fact that they were making a secret profit in the matter of the acquirement of this land. We have in addition the finding that he, by signing such receipt, "aided and abetted defendants Freeman and Cline in their scheme to increase the price of the real property in question to the signers," etc. The words "aid and abet" as thus used have a well understood meaning, and may fairly be construed to imply an intentional participation with knowledge of the object to be attained. It is well settled that findings must be construed to support a judgment if they can reasonably be so construed, and we are satisfied that the findings here must be held to establish that Robinson knew the purpose for which the false papers given by him were to be used.

3. We are of the opinion that the conclusion, that Whitlock was with the other defendants jointly liable as to the six thousand five hundred dollars secret profit, is supported by the findings. He is found to have aided and abetted Freeman and Cline in their scheme to increase by this amount the price of the property to the subscribers, by securing signers to the subscription agreement. We have seen that by the terms of this agreement, it was contingent upon securing 36 subscribers for 1 share each within 30 days, and the whole scheme of Freeman and Cline was dependent on this being accomplished. With actual knowledge of all the facts relative to this purchase, including the facts that the representation in the subscription agreement as to the price at which the property was to be acquired was false, and that Freeman and his immediate associates were making a secret profit of six thousand five hundred dollars, Whitlock not only signed the subscription agreement for himself and for Robinson, but also procured the signatures of two other subscribers, thus knowingly aiding and abetting in the consummation of the scheme. As we have heretofore stated, it was not essential to liability on his part that he should have been a party to the scheme from its inception or that he should have shared in the secret profits obtained by Freeman by means thereof. It is immaterial what his motive may have been, whether he felt that his own commission from Robinson was dependent on the success of Freeman's plan to make the subscribers pay thirty-nine thousand five hundred dollars, or desired to assist for some other reason. He with knowledge of all the facts willfully aided and abetted Freeman and Cline in their scheme, and is, therefore, jointly liable.

4. We are satisfied that, in view of the findings, the judgment in favor of Robinson as to the profits made by him upon the transaction cannot be disturbed. Whatever suspicions various facts found may arouse as to the existence of a scheme on the part of all the defendants to procure the formation of a corporation to purchase this property from the original owners, with a large secret profit to each of them, the findings as made prevent that conclusion so far as Robinson is concerned. According to the findings he was dealing solely with Freeman up to the time that he ratified Whitlock's act in signing his name to the subscription agreement, and there is nothing therein to

require the conclusion that he even knew prior to this that a corporation was being formed by Freeman to take the property. We may assume, in accord with the contention of learned counsel for plaintiff, that when he became a subscriber, a joint purchaser with his associates, holding as he did only a mere option to purchase the property, he was required to abstain from making a profit in the matter of the purchase without the knowledge of his associates. But the difficulty of plaintiff's case in this regard is that the findings do not show that the subscribers did not have full knowledge that Robinson was to make a profit on the transaction. The subscription agreement did not represent to the contrary, and it was entirely consistent with the statements therein contained that he was selling to the subscribers at a profit his option to purchase, and was interested in the matter other than as a subscriber. There was, of course, nothing wrong in his making a profit under the circumstances, unless the fact that he was so doing was not known to his associates on the subscription agreement. The findings on this point are limited to the proposition that they (except the defendants) did not know the terms of his authority to sell, or the price he was required to pay his co-owners; that he did not inform them as to the *amount* of his profit. But it is a necessary inference from another finding that they did know that he was to receive a profit. The court found "that none of the persons who signed said subscription agreement, except defendants . . . had any knowledge that said Whitlock, Freeman and Cline, or any of them, or any of the subscribers *other than said Robinson,* were to receive any part of the sum of $39,500 mentioned in said subscription agreement as the purchase price of said real property, or that said defendants, *other than said Robinson,* or any of them, were in any way interested therein other than as co-subscribers to said subscription agreement." We are entitled to draw necessary inferences from findings in order to support a judgment, and, as said before, must construe findings to support a judgment, where such a construction is not unreasonable. (See *Paine* v. *San Bernardino etc. Co.,* 143 Cal. 656, [77 Pac. 659]; *Nevills* v. *Moore Mfg. Co.,* 135 Cal. 561, [67 Pac. 1054]; *Krasky* v. *Wolpert,* 134 Cal. 342, [66 Pac. 309].) If the subscribers knew he was making a profit, as we must hold in view of the findings, the mere fact that they did

CLIV Cal.—4

not know the amount will not entitle them to complain, in the absence of some misrepresentation in the matter.

5. We do not see upon what theory the judgment in favor of Whitlock as to the three thousand dollar commission received by him from Robinson can be upheld. He had a three thousand dollar interest in the consummation of the purchase by the subscribers, which was unknown and undisclosed to his associates other than the other defendants, the Schencks, Dotter and Hickcox. His arrangement with Robinson as to compensation, as found by the court, was that Robinson would fix the price of the property "to defendant Freeman at the sum of $33,000, *of which* defendant Whitlock should receive as his compensation for finding a purchaser the sum of $3000, and that defendant Robinson should have and retain the balance of $30,000." The court found that Whitlock did not find in Freeman a purchaser willing and able to buy the property for thirty-three thousand dollars. Under these circumstances, and undoubtedly for the purpose of bringing about a consummation of this sale and enabling himself to realize this profit, he chose to associate himself as a joint purchaser with the other subscribers and to actively assist in procuring other necessary subscribers. When he did this, he assumed as to his associates, under a well-established rule of law, a relation analogous to that which exists between partners, and was precluded from making any secret profit out of the contemplated purchase at their expense. The implied understanding between joint purchasers is that each is engaging in an enterprise solely for the mutual and common benefit and advantage of all, and that each has a common interest with the others, according to the amount of his subscription. (See *Getty* v. *Devlin*, 54 N. Y. 403.) Whitlock knew that the property was being obtained from Robinson for thirty thousand dollars, and that three thousand dollars of the amount stated in the subscription agreement as the price at which the property could be obtained from Robinson and his associates represented his own personal profit in the transaction, to be made at the expense of his associates. It is elementary that a partner or an agent will not be allowed to make a profit for himself at the expense of his associates or his principal by any deception as to the purchase price, and that he will be held as a trustee for any profits so obtained. This rule has often been applied in trans-

actions of the kind here involved. (See *Walker* v. *Pike County etc. Co.,* 139 Fed. 609, [71 C. C. A. 593]; *Jenkins* v. *Frink,* 30 Cal. 586, [89 Am. Dec. 134]; *King* v. *Wise,* 43 Cal. 628; *Barry* v. *Bennett,* 45 Cal. 80; *Getty* v. *Devlin,* 54 N. Y. 403; *Mattern* v. *Canavan,* 3 Cal. App. 493, [86 Pac. 618]; *Johnston* v. *Little,* 141 Ala. 382, [37 South. 592]; *Hodge* v. *Twitchell,* 33 Minn. 389, [23 N. W. 547]; *Yale Gas Stove Co.* v. *Wilcox,* 64 Conn. 101, [42 Am. St. Rep. 159, 29 Atl. 303].) We think the facts in this case make the decision in *Milwaukee etc. Co.* v. *Dexter,* 99 Wis. 214, [74 N. W. 976] inapplicable. In view of the specific facts found, the further finding that Whitlock's services in finding a purchaser for said real property were fully performed and completed prior to the time he signed the subscription agreement and prior to the time when he agreed to become a member of the club and prior to the time when he asked either Dotter or Hickcox to sign the subscription agreement can mean no more than that the specific acts theretofore found by the court to have been done by him,— viz., the interesting of Freeman in the matter and the bringing of Freeman and Robinson together, were done prior to his becoming an associate in the joint enterprise.

The fact that some one or two of the subscribers other than the defendants knew or supposed that Whitlock was interested other than as a subscriber does not assist him (*Colton Imp. Co.* v. *Richter,* 26 Misc. Rep. 26, [55 N. Y. Supp. 486, 489].) See, also, *Burbank* v. *Dennis,* 101 Cal. 101, [35 Pac. 444].)

There is absolutely nothing in the claim that the fact that Robinson's name appeared in the subscription list to have been signed "per B. W.," showed that Whitlock was acting as Robinson's agent in the matter of the sale of the property.

Upon the facts found we are satisfied that it must be held that Whitlock is a trustee of plaintiff to the extent of his secret profit of three thousand dollars, and accountable therefor.

6. We find no error in the judgment other than the failure to grant a recovery against Whitlock on account of the three thousand dollars secret profit. It is suggested that in so far as the judgment cancels the two-thousand-dollar note given Robinson on account of the purchase price and remaining unpaid, because of the six thousand five hundred dollars secret profit made by Freeman in which Robinson did not participate,

it is unjust. But, as we have seen, Robinson was jointly liable as to this six thousand five hundred dollars, and plaintiff has paid all that it is legally required to pay on account of the purchase, and should not be required to pay this amount which it does not owe to one of those liable to return it in the event of its payment. If by reason of the arrangement between themselves, one of those jointly liable is compelled to pay more than his proportion, it is simply his misfortune. The law can afford him no relief. As to the liability in question, the defendants occupy the position of joint tort-feasors.

7. There is also an appeal by plaintiff from an order taxing costs and striking out plaintiff's memorandum of costs items aggregating $97.20, notary fees for taking the depositions of defendants before trial. The affidavit annexed to the cost-bill stated that such disbursements were necessarily incurred. The motion to strike out these charges was made on the ground, among others, that the taking of the depositions was unnecessary. It was stated in the notice of motion that said motion would be made upon the records, files, and papers in the above-entitled action, which, of course, included said depositions, the same having been filed among the papers in the cause. These records, files, and papers were considered by the court below on the hearing of the motion, but none of them except those constituting the judgment-roll have been brought before us, and we cannot tell what they show. Plaintiff undoubtedly had the right to have the depositions taken, and is entitled to recover the cost thereof if it was necessary to take them. (*California Farm and Fruit Co.* v. *Schiappa-Pietra,* 151 Cal. 745, [91 Pac. 593]; *Lindy* v. *McChesney,* 141 Cal. 351, 353, [74 Pac. 1034].) It may, however, have appeared to the trial court from the evidence considered on the motion that the taking of these particular depositions was entirely unnecessary to the protection of the rights of the plaintiff under any reasonable view of the case. We are not prepared to hold that the trial court is without power to disallow the cost of taking depositions where it appears to the court that such taking could not under the circumstances be necessary to the protection of the rights of a party. We must assume in support of the order that the evidence before the court, consisting of the files, records, and papers in the case, showed a case warranting such a conclusion. (See *Lindy* v. *McChesney,* 141

Cal. 351, 353, [74 Pac. 1034].)   It was not essential that the motion to retax costs should be accompanied by any affidavit. (*Senior* v. *Anderson*, 130 Cal. 299, [62 Pac. 563].)

On the appeal of defendant F. E. Robinson and on the appeal of defendant Ben Whitlock, the judgment of the superior court is in all respects affirmed.   On the appeal of plaintiff from said judgment, the judgment of the superior court is amended and modified, by adding at the end thereof the following, viz: "It is further ordered and adjudged that plaintiff, Lomita Land and Water Company, do have and recover from defendant, Ben Whitlock, the further sum of $3,399.55" and, as thus amended and modified, said judgment is affirmed. The order taxing costs is affirmed.   Each party shall pay his own costs of appeal.

Shaw, J., and Sloss, J., concurred.

Hearing in Bank denied.