CLARK *v.* DANIELS.

1. Corporations—Promoters—Oil and Gas Lease—Secret Profits.

> One who conspired with trustees named in subscription agreement to promote corporation, and with them dominated its organization and later control, was as fully a promoter as though he had been expressly named, and could not take secret profit in the way of overriding royalties on an oil and gas lease.

On duty of promoters to make disclosure to corporations, see annotation in 18 L. R. A. (N. S.) 1107.

2. SAME—CONSPIRATORS LIABLE FOR SECRET PROFITS—FIDUCIARY RELATION.

Persons who conspire with promoters to consummate transaction whereby a secret profit is obtained by the promoters are, equally with the latter, liable for such profit, although they did not occupy the fiduciary relation of promoters.

3. SAME—ACCOUNTING—SECRET PROFITS—EQUITY—JURISDICTION.

In suit by stockholders to require promoters who control corporation to account to it for secret profits in way of overriding royalties on an oil and gas lease, the situation is same as though the corporation itself were the plaintiff bringing suit to recover property belonging to it, and court of equity has jurisdiction.

4. SAME—SECRET PROFITS—STOCKHOLDERS ENTITLED TO STOCK ACCORDING TO AGREEMENT.

Stockholders had no duty to accept a return of money on discovery of claim of overriding royalties by promoters after oil well became productive, but they are entitled to their bargain for stock in the corporation unburdened by secret profits.

5. SAME—CORPORATION TAKES LEASE SUBJECT TO TERMS.

Where preorganization subscription agreement provided that, if oil well drilled on leased land proved productive, a corporation would be organized, the corporation, when organized, takes the lease subject to all its terms.

6. SAME—PROMOTER ENTITLED TO FAIR COMPENSATION FOR DRILLING TEST WELL.

Promoter, who drilled test oil well under subscription agreement that if well proved productive a corporation would be formed, is entitled to compensation for drilling the well, not at cost, but at fair price.

7. SAME—PROMOTERS WHO TOOK SECRET PROFIT LIABLE FOR MONEY EXPENDED BY CORPORATION DEFENDING THEM.

In suit by stockholders to require promoters who control corporation to account to it for secret profits, the money expended by corporation in defending suit is proper charge against defendants.

Appeal from Muskegon; Vanderwerp (John), J. Submitted January 21, 1930. (Docket No. 99, Calendar No. 34,793.) Decided March 6, 1930.

Bill by George W. Clark and others against O. A. Daniels and others for an accounting for secret profits under an oil and gas lease and for other relief. From a decree for plaintiffs, defendants appeal. Modified and affirmed.

*Alexis J. Rogoski,* for plaintiffs.

*Galpin, Smedley & Dunn,* for defendants.

FEAD, J. This is a suit to require O. A. Daniels to account to defendant corporation for secret profits in the way of overriding royalties on an oil and gas lease, claimed to have been reserved by him through a conspiracy with his wife, Margaret J. Daniels, and defendant Flanagan, as promoters and officers of the corporation, and for other relief hereinafter mentioned. Plaintiffs had decree.

August 23, 1928, O. A. Daniels, an experienced oil driller from Montana, obtained an oil and gas lease covering ten ácres of land in Muskegon county, which reserved to the lessors Dick a royalty of one-eighth, of production. Flanagan, a local resident, aided him in procuring the lease and helped him in other transactions. Under date of September 19th, the record discloses a sublease of five acres, executed by Daniels to his wife, retaining to himself an additional or "overriding" royalty of one-eighth, and providing that he should have $15,000 to drill a well on the premises to the Dundee sand, the price to be somewhat less if production in paying quantities were found in the "Traverse" formation. October 22d, he executed another lease to his wife for the other five acres on a similar overriding basis. Daniels' lease from Dick was acknowledged August 23d and recorded September 12th. The subleases were not recorded until February 4, 1929.

Under date of September 19, 1928, the record shows a "preorganization subscription agreement" in six duplicates, signed by Flanagan and M. J. Daniels, prepared for the purpose of securing money to drill a well. The agreement provided that if the well proved productive, a corporation should be formed with a capital of $30,000, and M. J. Daniels would transfer the lease to the corporation in exchange for $15,000 of the stock. Later a note was inserted in the agreement that Flanagan and M. J. Daniels had secured the other five acres.

Daniels was the first subscriber of money and pledged $1,000. Later some 75 persons subscribed in various amounts. The typewritten parts of the agreement were on sheets separate from those on which signatures were taken, so substitution of pages was easy. Plaintiffs claimed, and some of them testified, and the chancellor found, that O. A. Daniels had been originally named as a trustee in the agreement and the instrument had been changed to eliminate his name after subscriptions were taken.

Defendants insisted that the transaction had been conducted in accordance with the instruments as produced and without change in them. If that be true, the subscription agreement bears quite plain indication of a deliberate intent to deceive the subscribers. The use by Mrs. Daniels of her initials instead of her name in the lease and the recital that the sinking of the test well should be under the management of "H. C. Flanagan, M. J. Daniels, Mr. Daniels personally superintending the operations," has some significance in view of Flanagan's representations, hereafter stated, as to the identity of his associate. The agreement recited that if, after a reasonable test, the property proved unproductive, unexpended subscriptions should be re-

turned to the subscribers. As a matter of fact, the sublease upon which the agreement was based provided that Daniels should have $15,000 to drill a well, with no provision for the return of any sum if production failed after reasonable test. This was followed on September 29th by the execution of a formal contract between Flanagan and Mrs. Daniels, as trustees, with Daniels, in conformity with the sublease. But the most important misrepresentation was the recital that Flanagan and Mrs. Daniels "are the holders and owner of a certain oil and gas mining lease." Flanagan was not a holder or owner of a lease, or even a sublease. The Daniels still held complete control. The representation that the trustees had a lease instead of a sublease was important. A lease usually carries one-eighth royalty to the lessor; a sublease ordinarily carries an additional one-eighth or more to the sublessor. Whatever may have been Flanagan's appreciation of the situation, Daniels knew the agreement should have stated the fact of his claimed overriding royalty, and, as Mrs. Daniels had made a study of oil and gas transactions, she may be assumed to have had the same knowledge.

Flanagan solicited and took all the subscriptions, the Daniels sedulously keeping in the background. Flanagan represented to some of the plaintiffs that O. A. Daniels was associated with him in the project, made no mention of Mrs. Daniels as a participant, and, in answer to inquiries, made the direct representation that there was no overriding royalty, but the association would receive seven-eighths of the production. While it is claimed that Flanagan had the subleases with him while he was soliciting subscriptions, he never voluntarily showed them to any one, and only one subscriber witness was produced who claimed to have seen them. Flanagan

was paid by Mrs. Daniels ten per cent. of the amount of subscriptions.

Defendants made a strenuous attempt to keep Daniels, his wife, and Flanagan separated in the consideration of their activities. However, it is apparent they had common interests, were acting together to a common purpose, knew the contents of the subscription agreement, and the failure to mention the overriding royalty and to record and exhibit the subleases can lead to no other conclusion than that the overriding royalty was intentionally concealed from the subscribers. Their concert of action carried over to control of the corporation later.

The subscription money was deposited in the bank in the name of Flanagan and Mrs. Daniels, the first deposit being October 4th and the last check drawn to Daniels December 17th, about which time the well came into unexpectedly abundant production. While the bank deposits appear to negative the substitution of Mrs. Daniels for Daniels as original promoter, they do not negative the finding of conspiracy to deceive.

A meeting to organize the corporation was held January 17th, at which time plaintiffs first learned of Daniels' claim of overriding royalty. The subleases were not produced even at that meeting. The plaintiffs protested at the additional royalty, and also claimed that Flanagan had represented to them that a well was to have been drilled at cost; that $15,000 was excessive. A board of directors was elected by unanimous vote, including that of plaintiffs.

The corporation was organized February 2d. This suit was begun prior thereto, and the bill amended afterward. The first meeting of the stockholders was held February 15th, at which the defendants were formally elected directors; O. A.

Daniels was made president and manager, and Flanagan secretary and treasurer. At a meeting of the board of directors, assignment of the subleases from Mrs. Daniels was accepted and the stock in payment voted to her. The minutes of this meeting also contain mention of Daniels' claim to an overriding royalty, that it was to be kept in a bank to await determination of the suit, that litigation by plaintiffs had begun and an attorney was instructed to attend to both matters.

The record also shows that in June some 75 per cent. of the stockholders voted to approve the Daniels transaction, in accordance with their claims, plaintiffs voting against approval. It also shows that the other director defendants have filed a waiver of their claim of appeal. No specific contention is made in connection with these actions, and they were apparently presented for their moral effect. In any event, whatever complications of accounting they have produced are not now before us.

Whether Daniels was originally named as trustee in the subscription agreement is not decisive. He at least conspired with the named trustees to promote the corporation and with them dominated its organization and later control. He was as fully a promoter as though he had been expressly named. He could not take a secret profit. The applicable law is:

"By a secret profit is meant such a profit as is made without disclosing the same to the real parties in interest and obtaining their express or implied consent thereto. * * * The acts of a promoter will be carefully scrutinized, and in determining whether he is liable as for a secret profit, the court will look beyond the form to the substance of the transaction." 1 Fletcher, Cyclopedia Corporations, § 135.

"The promoters of a corporation are the agents of the corporation and occupy a fiduciary relation to it and its stockholders, and will not be permitted to take a secret advantage of the stockholders." (Syllabus.) *Fred Macey Co.* v. *Macey,* 143 Mich. 138 (5 L. R. A. [N. S.] 1036).

"Persons who conspire with promoters to consummate the transaction whereby a secret profit is obtained by the promoters, are, equally with the latter, liable for such profit, although they did not occupy the fiduciary relation of promoters, had no dealings with the corporation or its members, and made no false misrepresentations to the stockholders, nor knew that any were made. This rule is based on the well-established principle that 'where several persons combine to carry out a fraudulent conspiracy to cheat another, each and all of such persons are liable to the defrauded party, without reference to the amount of the fruits of the fraudulent transaction he obtains or the degree of his activity in the scheme.' " 1 Fletcher, Cyclopedia Corporations, § 148.

"If there is not only not a full and fair disclosure by a promoter in dealings with the corporation, but affirmative misrepresentation, fraud, and deceit, then not only the promoter, but other persons as well, who stand in no fiduciary relation toward the corporation or its members, but who, with knowledge of the fraud, concur with the promoter in carrying out his fraudulent scheme, will become liable to the corporation in an action for what it has lost thereby." 14 C. J. p. 303.

See, also, *Downey* v. *Finucane,* 205 N. Y. 251 (98 N. E. 391, 40 L. R. A. [N. S.] 307); *Lomita Land, etc., Co.* v. *Robinson,* 154 Cal. 36 (97 Pac. 10; 18 L. R. A. [N. S.] 1106).

Defendants' contention that plaintiffs' remedy is at law by way of action for damages for fraud or in assumpsit to recover back the money paid for

stock on rescission would be sound if plaintiffs were suing for personal damages to themselves. Their bill, however, is to right corporate wrongs and for corporate relief. The situation is the same as though the corporation itself were the plaintiff, bringing the action to recover property belonging to itself. The court of equity had jurisdiction.

"There is no doubt of the power of a court of equity in case of fraud, abuse of trust, or misappropriation of corporation funds, at the instance of a single stockholder, to grant relief, and compel a restitution." *Miner* v. *Ice Co.*, 93 Mich. 97 (17 L. R. A. 412).

See, also, *Fred Macey Co.* v. *Macey, supra; Robinson* v. *DeLuxe Motor Car Co.*, 170 Mich. 163; *American Forging & Socket Co.* v. *Wiley*, 206 Mich. 664; 3 Comp. Laws 1915, § 13580.

Plaintiffs had no duty to accept a return of the money on discovery of the claim of overriding royalties after the well became productive. They were entitled to their bargain for stock in the corporation unburdened by secret profits.

The decree requiring transfer of the Dick lease to the corporation, freed from Daniels' claim of overriding royalty, is affirmed.

Certain other items of the decree are attacked. It must be remembered that the action is not for damages to plaintiffs personally for fraud, but upon accounting to the corporation for secret profits and improper appropriation of funds. Upon some items further testimony is necessary to determine the proper amounts, unless an agreement is reached.

1. The decree will be modified to eliminate the provision requiring Daniels to reimburse the corporation for the bonus in oil provided in the Dick

lease. The corporation takes the lease subject to all its terms.

2. Daniels is entitled to compensation for drilling the well, not at cost but at a fair price, to be determined from testimony to be taken.

3. The money expended by the corporation in defending Flanagan and Daniels in this suit is a proper charge against them, but the amount is to be shown.

The cause will be remanded to the circuit court to take testimony, as above indicated, and upon its return with the report of the chancellor thereon a decree will be settled in this court.

WIEST, C. J., and BUTZEL, CLARK, POTTER, SHARPE, and NORTH, JJ., concurred. McDONALD, J., did not sit.