## SEXTON v. SWORD S. S. LINE, INC.
### No. 201.

Circuit Court of Appeals, Second Circuit.

March 31, 1941.

Charles E. Wythe, of New York City (Horace M. Gray, of New York City, on the brief), for petitioner-appellant.

Arthur G. Syran, of New York City, for respondent-cross-appellant.

Arthur Abrams, of New York City (Maurice V. Seligson, of New York City, of counsel), filed a brief for minority stockholders.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

These appeals concern the correctness of the allowance, recommended by the bankruptcy referee as special master and confirmed by the district court, to Emory Sexton, a cotrustee in reorganization of the debtor herein, Sword Steamship Line, Inc. The proceedings began April 19, 1938, with the filing of a voluntary petition under the then § 77B of the Bankruptcy Act, 11 U.S. C.A. § 207, by the debtor, owner and operator of six cargo vessels in the coastwise trade. At that time the debtor had liabilities of about $314,000, some of its vessels were not in service, hull insurance premiums were in default, and it obviously sought court protection as the only alternative to liquidation. It was allowed to remain in possession, and to continue the operation of its business, but Emory Sexton, a creditor and ship broker, was named cotrustee.

Working capital was procured through the issuance of trustee's certificates, and after the reinstatement of hull insurance, premiums were met in the same way. For almost two years the business was continued without any decisive development, until the winter of 1939-40, when the value of bottoms began to rise rapidly, owing to the ravages of the European war. By March, 1940, Sexton was able to charter three of the debtor's vessels to the Ocean Dominion Steamship Corporation at a favorable rate of rental for a period of ten months, with an option of renewal for an additional eight months, and as a part of the contract to obtain from the same company a $500,000 loan secured by a first mortgage on all six vessels. This sum was $55,000 more than sufficient to pay all claims and charges in full. After this was done the proceedings were terminated by an order permitting Sexton and others to file petitions for allowances. Appeals from the order approving the loan and charters and the order terminating the proceedings were taken by Cost Vendramis, minority stockholder (in whose behalf alone apparently is filed the brief on this appeal for "minority stockholders"). Recently we affirmed the first order, modified the second order to allow minority stockholders to object to the trustees' accounts, and affirmed the denial of Vendramis' motion for an examiner to investigate alleged misconduct of debtor's officers and directors. Sword S. S. Line v. Vendramis, 2 Cir., 116 F.2d 665; Vendramis v. Sword S. S. Line, 2 Cir., 116 F.2d 669.

Upon Sexton's application for $40,000, that of his attorney for $22,500, and that of the debtor's attorney for $15,000, a total of $77,500 or nearly a quarter of the amount of the debtor's liabilities at the outset, the special master recommended allowances of $22,000, $7,000, and $9,000, respectively, or $38,000, but with a set-off against Sexton's allowance of one-half the commissions payable to his partner, Chester B. Kellogg, as brokerage on the charters with Ocean Dominion. The total commissions payable on these charters will amount to about $13,000 if the option to renew is not exercised, $27,000 if it is. On exceptions filed

by Sexton alone these recommendations were in every respect adopted by the court, reserving payment to Sexton, however, until it should determine the exact amount of the offset. Sexton petitioned this court for leave to appeal, which the debtor opposed, but, in turn, asked leave to appeal for a reduction "in the event that leave is granted to the Appellant." We granted both leaves.

Both parties attack the finding that $22,000 represents the reasonable value of Sexton's services during the two-year period. In his favor it may be said that he kept in close daily contact with the affairs of the debtor and devoted much time to its business, and that he, principally, conducted the two most important series of negotiations of the period, leading to the reinstatement of the debtor's hull insurance and the $500,000 loan from Ocean Dominion which made termination of the proceedings possible.

On the other hand, his own services are not shown to have been of critical importance in either case. The evidence indicates that the reinstatement of the insurance, with the same company, although through different brokers, was effected largely by the issuance of trustee's certificates, which were acceptable in payment of premiums, and that it did not require more than five days of his time. The contract with Ocean Dominion was obviously of the utmost importance; nor should Sexton's part in arranging it be belittled—in fact, much more credit seems to be due him than Kellogg. But again the evidence showed that he was more nearly the chance instrument of the event, while the very sharp increase in the value of shipping was the effecting cause.

Most of Sexton's time was devoted to "Operations," was supplementary to the administration of the four regular officers of the debtor, and does not seem to have effected any changes in policy or to have relieved the debtor of any former expenses. His financial services were hardly more than the issuance of trustee's certificates to obtain loans on the order of the court. In other respects his services, although diligent and faithful, were of a routine nature.

On the whole, we conclude that the special master, who carefully noted and weighed all relevant considerations in his report, was justified in his recommendation and there is no error in this allowance.

If the final estimate of the value of Sexton's services was somewhat overly liberal, we think that it did not pass the limits of a reasonable discretion with which this court will not interfere on appeal. Newman v. Ambassador Apts., 3 Cir., 101 F.2d 307; In re Albert Dickinson Co., 7 Cir., 104 F.2d 771, affirmed sub nom. Dickinson Industrial Site, Inc. v. Cowan, 309 U.S. 382, 60 S.Ct. 595, 84 L.Ed. 819.

The propriety of setting off against Sexton's allowance one-half the commissions paid or to be paid Kellogg on the charters to Ocean Dominion is based by the special master on a finding that Kellogg and Sexton were general brokerage partners at the time the transaction was consummated. Consequently Sexton was then entitled under the brokerage contract to receive one-half the amount of the commission payable by the estate of which he himself was the trustee—a violation of his fiduciary obligations, regardless of lack of prejudice to the estate. Magruder v. Drury, 235 U.S. 106, 35 S.Ct. 77, 59 L.Ed. 151; cf. A. L. I. Restatement, Trusts, § 203; Woods v. City Nat. Bank & Trust Co., 61 S.Ct. 493, 85 L.Ed. ——. Kellogg, of course, knew of Sexton's position.

Sexton challenges the set-off only as proceeding from a false premise. He points out that the commissions were made payable to Kellogg, not to the firm, and maintains that he never had a right to any share in them. Both he and Kellogg, however, testified that profits of the firm were usually divided equally, and that, until after the first hearing on this question, there had been no specific mention between them of a special allocation in this instance. Furthermore, the court, when asked to approve the transaction, was not informed of the partnership relation. The evidence is more than sufficient to sustain a finding of Sexton's equal participation in the commission.

If this is so, the purported relinquishment of his claim by express agreement with Kellogg after the first hearing is entirely futile. If a trustee holds an alleged claim against the estate which the law does not recognize, or if he has received money from the estate which he is bound to repay, he cannot validate his claim or avoid his obligation by giving or trading the claim or money to another. That would be to allow the trustee to transfer to his partner rights which belong not to him, but to the estate.

Should Sexton be required to refund all commissions, rather than merely one-half of them? The former seems usual, on the theory that all are forfeited, and, if they have been paid, the fiduciary "and others who knowingly join a fiduciary in such an enterprise likewise become jointly and severally liable with him for such profits," i.e., "all the profits obtained by him and those who were associated with him in the matter." Jackson v. Smith, 254 U.S. 586, 589, 41 S.Ct. 200, 201, 65 L.Ed. 418, 424. There the two defendants and one who was receiver of certain property to be sold at auction had arranged to be jointly liable for the purchase price of the property if one of the defendants should buy it, and to hold it jointly thereafter. It was bought and soon resold for a cash profit, which was divided equally among the three. The two defendants were held to account for the receiver's profits, as well as their own. To the same effect is Irving Trust Co. v. Deutsch, 2 Cir., 73 F.2d 121, certiorari denied 294 U.S. 708, 55 S.Ct. 405, 79 L.Ed. 1243. Magruder v. Drury, supra, cited in Jackson v. Smith, supra, as authority for the proposition that any participant—either a trustee or one of his associates—is liable for the profits of all, actually involved the recovery by a cestui of commissions, instead of profits, from the resale of property. In none of these cases was there any suggestion that the transaction had been unfair to the cestui's interests. Thus in Wendt v. Fischer, 243 N.Y. 439, 154 N.E. 303, judgment for the entire amount of the commissions was rendered against each of the partners, all of whom were sued. See the same case below, 215 App.Div. 196, 213 N.Y.S. 351. Of course, where the fraud to the cestui is actual, rather than presumed by the strict rules fixing a fiduciary's responsibility, the principle of the joint and several liability of each participant is universally recognized. Emery v. Parrott, 107 Mass. 95; Lomita Land & Water Co. v. Robinson, 154 Cal. 36, 97 P. 10, 18 L.R.A., N.S., 1106; Zinc Carbonate Co. v. First National Bank, 103 Wis. 125, 79 N.W. 229, 74 Am.St.Rep. 845.

Nevertheless, notwithstanding our undoubted power, we are loath to penalize the trustee to that extent under the circumstances. Although the debtor does present the legal point to us, yet it is clear that its actions are mainly defensive. It made no exceptions to the referee's report, and asked for leave to appeal only in the event that Sexton's petition for leave was granted. Though it had full knowledge of the situation throughout, it took no appeal from the order approving the contract containing provision for the commission to Kellogg. The undoubted benefit to the estate from the contract has been shown. The situation is more the result of inadvertence than intent. It could have been taken care of originally by the referee had appeal then been made to him; and we do not think that in this equitable proceeding we should now upset the referee's conclusion made after careful consideration and confirmed by the court.

Affirmed.

L. HAND, Circuit Judge (concurring).

There is of course no doubt that a fiduciary must restore to the estate all gains to which he may become entitled, arising out of any transactions between himself and a firm of which he is a member or in which he is interested in any other way. There is equally no doubt that he is liable for all losses which such transactions may cause his estate, and as to these his liability is not limited by his proportionate interest in the firm assets or profits; he is liable in solido. But in the case at bar brokerage fees on the charter-parties would have been due whoever procured them, and their payment therefore caused no loss to the debtor that it would not have had to bear anyway. Conceivably Sexton's allowance as receiver ought not to have been so high because the bulk of his services were in procuring the charter-parties, but that is a separate question. Judge Augustus N. Hand and I do not, however, think that a disposition of the case demands a decision whether he could in any event have been held liable for Kellogg's half of the fees, or whether his liability did not extend beyond his own half; and we prefer to leave that question open without indicating any opinion on it either way.

This we can do because if Sexton could be held for the full amount, we agree with Judge Clark that it would be too severe a penalty to exact from him, considering that he could never have collected more than one half the fees. If on the other hand he can be held only for his own share and not for his partner's, the result is the same; for there can be no question that he was Kellogg's partner when the fees were earned and as such he then became entitled to one half of them. His subsequent assignment of that half to Kellogg did not affect

his liability to the estate. As soon as the fees were earned the law imposed upon his behalf a constructive trust which compelled him to hold them for the estate's benefit; he could no more transfer his interest in them than he could transfer any other asset of the estate, and he remained liable after he had done so. For these reasons we concur in affirming the order.